# EXHIBIT A

12-Person Jury

Return Date: No return date scheduled
Hearing Date: 12/27/2019 10:00 AM - 10:00 AM
Courtroom Number: 2410
Location: District 1 Court
Cook County, IL

FILED
8/29/2019 11:30 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019CH10028

6380209

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | | |
|---|---|---|
| **TCC WIRELESS, LLC**, a Delaware limited Liability company, | ) | |
| Plaintiff, | ) | Case No.: 2019CH10028 |
| v. | ) | Jury Demand |
| **Kenneth Siller**, an individual, | ) | |
| Defendant. | ) | |

## VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

TCC Wireless, LLC ("TCC Wireless"), through its undersigned counsel, complains against Defendant Kenneth Siller as follows:

### *The Parties*

1. TCC Wireless is a Delaware limited liability company, with its principal place of business in Illinois. Therefore, TCC Wireless is a citizen of Illinois.

2. Defendant is an individual who resides in the State of New York. Defendant continuously and systematically entered the State of Illinois to transact business, among other things, by traveling to Illinois on numerous occasions in connection with the contracts and business relationships more fully described below.

3. Defendant consented to exclusive jurisdiction and venue in Illinois.

4. This Court has jurisdiction over Defendant pursuant to 735 ILCS 5/2-209 because, among other things, Defendant operates business in Cook County, Illinois and the parties entered into a contract or promise substantially connected to Illinois. Additionally, Defendant consented to exclusive jurisdiction and venue in Illinois and during his employment with TCC Wireless conducted business in Cook County.



PFS:007509.0006.2166918.2

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

5. Venue is proper in this Court pursuant to 735 ILCS 5/2-101 because Defendant is a nonresident of the State of Illinois.

***General Allegations***

6. TCC Wireless is an authorized independent dealer for T-Mobile, USA, Inc. TCC Wireless has retail stores that sell both cellular phones and related accessories and cellular phone plans, among other things, for T-Mobile.

7. The geographic scope of TCC Wireless' business is expansive. TCC Wireless has offices and retail stores in Illinois, as well as thirteen other states throughout the country. TCC Wireless' market encompasses retail stores in the following states: Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Massachusetts, New York, New Jersey, Ohio, Pennsylvania, Rhode Island, South Carolina and Wisconsin.

8. The wireless and cellular phone industry is very competitive. Several companies compete with TCC Wireless in the very same market for the same customers and the same sales channels. Moreover, TCC Wireless' success depends heavily on its ability to identify, negotiate, and lease retail space that is favorable for the operation of its business, and to identify appropriate markets for penetration. For these reasons, executives within the cellular phone retail industry are particularly competitive, as retail operators are constantly seeking information regarding expansion and market opportunities.

9. TCC Wireless spends substantial resources of time and hundreds of thousands of dollars to develop, cultivate and retain favorable relationships with its customers, to identify valuable market space, and to identify potential opportunities for business growth.

10. On or about December 1, 2016, TCC Wireless hired Defendant as its Senior Vice President of Sales and Marketing. In that position, Defendant was in charge of all of TCC

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

Wireless' sales and marketing strategies and strategic goals in growing its business, including overseeing 1,500 employees.

11. In connection with Defendant's employment with TCC Wireless, Defendant signed and agreed to the terms of an Employment Agreement. The Employment Agreement is attached as Exhibit A. Defendant negotiated the terms of the Employment Agreement with TCC Wireless.

12. Pursuant to the terms of the Employment Agreement, Defendant acknowledged that he fully understood the contents of the Employment Agreement and was encouraged to seek independent legal counsel before he voluntarily executed the Employment Agreement. (Employment Agreement ¶ 15(g), Ex. A.)

13. The Employment Agreement contains, among other things, a non-compete provision, which provides, in relevant part:

> [D]uring the period commencing on the Effective Date [December 1, 2016] and ending upon the expiration of one (1) year from the date that Executive ceases to be employed by the Company or any of its Affiliates for any reason (the "<u>Covenant Period</u>"), engage, or compete with any Protected Party, in the Business, or any facet of the Business anywhere within the United States of America, as an employee, independent contractor or otherwise;

(Employment Agreement ¶ 7(a)(i), Ex. A.) The "Business" is further defined as "operating wireless phone stores and the sale of wireless phones, accessories and related products and services, as the Company determines from time to time (all such activities and services provided by the Company and any and all other businesses and operations in which the Company may hereafter engage)." (*Id.*, Recitals(A), Ex. A.)

14. The non-compete provision of the Employment Agreement is reasonable as to the duration, geographic area and line of business that TCC Wireless now seeks to protect. The non-compete provision is designed to protect TCC Wireless' reasonably competitive business

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

information, including confidential information relating to its finances and business performance, employee compensation structure, employee commission structure, information regarding TCC Wireless' proprietary operational technology platform, sales strategies, business plans, operations, market strategies, and strategies for growth and sales, including plans for target acquisitions.

15. The Employment Agreement also contains a non-solicitation provision, which provides, in relevant part, as follows:

> iii. during the Covenant Period divert from any Protected Party, or by aid of others, do anything which would cause diversion from any Protected Party, of any business with any Customer or supplier with which such Protected Party has any contact or association in connection with the business; or
>
> iv. during the Covenant Period, solicit, induce or attempt to induce, either directly or indirectly, any employee or independent contractor of any Protected Party, (A) to change his, her or its contractual relationship with any Protected Party, (B) to leave the employment of or terminate his, her or its contractual relationship with any Protected Party, or (C) enter into the employ of or a contractual relationship in which Executive [Siller] has any interest whatsoever, or any competitor of any of the Protected Parties.

(Employment Agreement ¶ 7(a), Ex. A.)

16. The Employment Agreement contains, among other things, a confidentiality provision that defines Confidential Information as follows:

> In order to facilitate the provision of Executive's [Siller's] services to the Company [TCC Wireless] under this Agreement, the Company has disclosed and will disclose information it considers proprietary and confidential. This information may include, without limitation: (a) business financial, marketing and operational plans; (b) forecasts and projections; (c) sales plans and data; (d) information which relates to the Company's proprietary products, prototypes or plans; (e) customer lists and information; (f) the Company's listing information; and (g) other information whether or not identified as confidential of a confidential and non-public nature (collectively "<u>Confidential Information</u>"); provided, however, that Confidential Information shall not include any information: (x) prior to the Effective Date, was generally publicly available; (y) becomes publicly available without fault of or action on the part of Executive; or (z) is acquired by Executive following the cessation of employment with, or as a

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

> member of, the Company from a third party (other than a Protected Party), free from any restrictions as to its disclosure.

(Employment Agreement ¶ 9, Ex. A.)

17. The Employment Agreement's confidentiality provision requires Defendant to safeguard TCC Wireless' Confidential Information. The Employment Agreement provides, in that regard, as follows:

> (a) Executive agrees to hold Confidential Information in the strictest confidence. Executive will not disclose the Confidential Information to a third party;
>
> (b) Executive will not, at any time, use Confidential Information in any fashion, form, or manner, except to facilitate the provision of services by Executive on behalf of the Company;
>
> (c) Confidential Information may not be copied or reproduced without the Company's prior written consent;
>
> (d) Confidential Information shall at all times remain the sole property of the Company. Executive shall have no license, ownership rights, or any other rights or interests in the Confidential Information. Confidential Information disclosed by the Company, including any copies thereof, shall be returned to the Company by Executive upon request by the Company; provided, however, that upon termination of this Agreement, Executive shall return any Confidential Information within ten (10) days of such termination, without any request by the Company necessary or required.

(Employment Agreement ¶ 9, Ex. A.)

18. By signing the Employment Agreement, Defendant agreed that the restrictions set forth in the restrictive covenant provisions of the Employment Agreement, among others, are "reasonable and valid in geographical and temporal scope and in all other respect." (Employment Agreement ¶ 7(c), Ex. A.)

19. As the Senior Vice President of Sales and Marketing, Defendant was in a position where TCC Wireless shared with him and he otherwise acquired confidential and proprietary information regarding, among other things, the following:

(a) its finances and business performance. Defendant received, among other

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

things, regular financial reports on sales, earnings, business margins, employee compensation structures, employee commission structures, as well as details on TCC Wireless' proprietary operational technology platform;

(b) its business plans including, but not limited to, information regarding TCC Wireless' growth and sales strategy, including but not limited to TCC Wireless' plans to target acquisitions in the next several years; and

(c) TCC Wireless's sales strategies, the performance of many of its retail stores through the country, including performances of individual employees.

20. TCC Wireless relied on Defendant's agreement to be bound by the terms of the Employment Agreement is sharing its Confidential Information with him.

21. As the Senior Vice President of Sales and Marketing, Defendant worked with TCC Wireless' customers and sales channels with whom TCC Wireless maintains relationships nationwide.

22. During the course of Defendant's employment with TCC Wireless, he became familiar with, among other things, the manner in which TCC Wireless operates, and its sensitive information regarding its business such as its compensation structures, employee commission structure and payouts, proprietary operational technological platform, employment strategies, strategic growth plans, sales volumes, business profitability, weaknesses, as well as sales goals and targets, which apply to its stores nationwide.

23. Defendant was hired because of his background in the cellular phone industry. Recognizing that he would bring unique talent to TCC Wireless in a way to expand its business, TCC Wireless provided Defendant with a $120,000 signing bonus and one of the highest salaries in the business, averaging from $400,000-$450,000 per year. In turn, Defendant agreed to an

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

Employment Agreement that contained restrictive covenants, which were negotiated between the parties. Based on these covenants, TCC Wireless introduced Defendant to its proprietary and unique internal operations, software and back office operations.

24. Effective on or about August 5, 2019, Defendant voluntarily resigned from his position as Senior Vice President of Sales and Marketing for TCC Wireless.

25. On or about August 22, 2019, Defendant became employed with Express Stores, which is a direct competitor of TCC Wireless. (*See* Announcement, Ex. B.) Like TCC Wireless, Express Stores is an authorized independent dealer for T-Mobile, USA, Inc. and is in the business of selling sell both cellular phones and related accessories and cellular phone plans, among other things, for T-Mobile in many of the exact markets in which TCC Wireless operates its business and retail stores. Defendant did not choose another wireless carrier (e.g., non-T-Mobile) or even a T-Mobile dealer outside the markets in which TCC Wireless operates.

26. Defendant is now representing Express Stores in competition with TCC Wireless, immediately after and within a one-year period of terminating his employment with TCC Wireless.

27. On or about August 22, 2019, in violation of the non-solicitation provision in the Employment Agreement, Defendant, directly or indirectly, solicited Michael Erra, an employee of TCC Wireless to terminate his employment with TCC Wireless and to commence employment with Express Stores.

28. TCC Wireless entered into the Employment Agreement containing the above provisions to protect its interest in its Confidential Information and to protect its interest in its customers. TCC Wireless also entered the Employment Agreement to protect its employment workforce from the possible poaching of employees with confidential information, to protect the

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

costs associated with recruiting and hiring employee, to ensure a stable workforce necessary to ensure the stable growth of its business, and to prevent an *en masse* of resignations. Based on these covenants, TCC Wireless *introduced* Defendant to the rest of its management team, regional managers, district managers, and sales representatives. TCC Wireless has a protectable interest in enforcing the terms of the non-compete, non-solicitation and confidential provisions of the Employment Agreement.

29. The Confidential Information and knowledge Defendant currently retains are part of his thoughts and mental impressions, and, upon information and belief, his continued work with Express Stores creates the likelihood of the inevitable disclosure of the Confidential Information that are necessary and permanently maintained as part of his thoughts and mental impressions. Defendant cannot help but use his knowledge of TCC Wireless' compensation and commission structures, employment strategies, the proprietary operational technology platform, his knowledge of planned acquisition and market strategies, and his knowledge of existing products. Even if Defendant were to agree not to disclose any of this information, such an agreement would be completely ineffective because the Confidential Information acquired by Defendant during his employment by TCC Wireless is exactly the type of information that any sales manager needs and must use to effective compete in the retail cellular phone industry.

30. Express Store's employment of Defendant further threatens to, and will inevitably result in the disclosure of TCC Wireless' Confidential Information. As a former Vice President of Sales and Marketing, virtually all of TCC Wireless' Confidential Information will assist Defendant in targeting markets, targeting employees and will enable Defendant to directly compete with TCC Wireless.

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

31. Defendant agreed that in the event that he violated the restrictive covenants, among other things, TCC Wireless would be entitled to injunctive relief (Employment Agreement ¶¶ 7(c), 10, Ex. A.) The Employment Agreement provides:

> Specific Performance. In the event of a breach or attempted breach of any of the covenants set forth in Section 7, Section 8 or Section 9, in addition to any and all legal and equitable remedies immediately available, such covenants may be enforced by a temporary and/or permanent injunction. The parties agree that the remedy at law for a breach or threatened breach of any of the covenants set forth in Section 7, Section 8 or Section 9 would be inadequate.

(Employment Agreement ¶ 10, Ex. A.)

32. Defendant has previously revealed Confidential and proprietary information during the course of his employment in July 2018, when he met with senior management of T-Mobile and a prospective new partner in the T-Mobile dealer channel and disclosed confidential operational and financial information of TCC Wireless without its consent. TCC Wireless is rightfully concerned that Defendant will continue to disclose its Confidential Information now that he is no longer employed with the Company.

## COUNT I
## Breach of Contract

33. TCC Wireless incorporates the allegations contained in paragraphs 1 through 32 above as if full restated herein.

34. The Employment Agreement is a valid and enforceable agreement.

35. By signing the Employment Agreement and accepting the consideration offered, Defendant agreed to be bound by, among other things, reasonable non-compete and non-solicitation covenants and to never disclose any Confidential Information.

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

36. By working for Express Stores after and within a one-year period after terminating his employment with TCC Wireless, Defendant has breached the non-compete provision of the Employment Agreement.

37. By soliciting an employee of TCC Wireless to leave his employment with TCC Wireless to work for Express Stores, Defendant has breached the non-solicitation provision of the Employment Agreement.

38. As an employee of Express Stores, Defendant already has breached the terms of the reasonable non-compete and non-solicitation provisions in the Employment Agreement, and it is inevitable that he will continue to breach the Employment Agreement in a number of ways, including, but not limited to, his continued employment and work with Express Stores, providing confidential information to Express Stores, and soliciting or otherwise influencing and inducing (whether directly or indirectly) TCC Wireless employees to leave their employment with TCC Wireless to work for Express Stores, and soliciting or otherwise influencing and inducing (whether directly or indirectly) TCC Wireless's customers to do business with Express Stores instead of with TCC Wireless.

**Injunctive Relief**

39. TCC Wireless incorporates paragraphs 1 through 38 above as if fully restated herein in support of its request for injunctive relief.

40. TCC Wireless took reasonable efforts to maintain its secrecy of its Confidential Information, which provide actual and expected economic value to TCC Wireless.

41. Defendant's work for and/or employment with Express Stores has, upon information and belief, caused and will continue to cause, TCC Wireless irreparable injury and financial damage by knowingly, unlawfully taking and utilizing TCC Wireless's Confidential

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

Information and trade secrets and knowingly exploiting that information to his own advantage and the advantage of Express Stores. TCC Wireless has been damaged and will continue to be damaged in the form of lost competitive position and advantage, potential loss of employees, potential lost customers, revenue, and good will and other immeasurable, unquantifiable and irreparable injuries.

42. Defendant will, upon information and belief, either knowingly or through inevitable disclosure of his knowledge of TCC Wireless's trade secrets and Confidential Information continue to unlawfully exploit TCC Wireless's Confidential Information and trade secret information unless enjoined by this Court.

43. The damage to TCC Wireless resulting from Defendant's misappropriation of Confidential Information and trade secrets will be difficult to quantify and, in all likelihood, will be impossible to qualify with precision.

44. TCC Wireless is entitled to an order commanding Defendant, and any other person acting together or in concert with him who possesses any document, record of information of TCC Wireless, or any information derived therefrom, to return any and all documents, records and data to TCC Wireless.

45. TCC Wireless is further entitled to any injunction preventing the continued actual or threatened misappropriation, use and disclosure of Confidential Information and trade secrets obtained through or derived from Defendant's theft.

46. The value of the Confidential Information to be protected, although difficult to quantify monetarily, exceeds the value of $75,000. TCC Wireless spent hundreds of thousands of dollars developing its products, strategies and customers. Moreover, the loss of only a few of

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

its customers would exceed the value of $75,000. The value of the business managed by Defendant exceeded $1 million.

47. Monetary damages alone are insufficient to prevent continuing and ongoing damage and harm to TCC Wireless if Defendant continues his work and/or employment for Express Stores in violation of the Employment Agreement as set forth herein and TCC Wireless has no adequate remedy at law for Defendant's breaches of contract, misappropriation of Confidential Information and trade secrets because TCC Wireless invested a significant amount of time, money and energy to establish and foster its relationship with its customers and employees. The destruction of one's business relationship has long-term consequences because these relationships evolve over many years of development resulting in increased business and revenue over the life of the relationship. Consequently, the damage suffered by TCC Wireless is difficult to calculate because it cannot be clearly determined how much revenue any specific relationship would have created.

48. If Defendant is permitted to continue to work for a competitor in violation of his non-compete and to continue to solicit TCC Wireless employees and use TCC Wireless's Confidential Information and trade secrets, TCC Wireless will suffer additional irreparable harm.

49. TCC Wireless is justifiably concerned that any additional actions by Defendant will have tremendous impact on its goodwill, reputation and business.

50. TCC Wireless is entitled to injunctive relief specifically prohibiting Defendant from working for Express Stores and from using information he learned and had access to while employed at TCC Wireless.

51. Equities favor granting TCC Wireless an injunction. TCC Wireless has complied with all material terms of the Employment Agreement. Defendant, on the other hand, has

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

violated, is violating, and will continue to violate the non-compete provision of the Employment Agreement by working for Express Stores.

WHEREFORE, Plaintiff TCC Wireless, LLC requests that judgment be entered in its favor and against Defendant Kenneth Siller, as follows:

(A) An injunction temporarily, preliminarily, and permanently prohibiting Defendant during the period ending August 5, 2020 from working for any competitor of TCC Wireless, LLC, including Express Stores, in the following states: Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Massachusetts, New York, New Jersey, Ohio, Pennsylvania, Rhode Island, South Carolina, and Wisconsin, and any other state in which TCC Wireless may engage within the restrictive period;

(B) An injunction temporarily, preliminarily, and permanently prohibiting Defendant during the period ending August 5, 2020 from soliciting, inducing or attempting to induce, either directly or indirectly, an employee or independent contractor of TCC Wireless, LLC to change his, her or its contractual relationship with TCC Wireless or to enter into the employ of or a contractual relationship with Defendant, or an entity in which Defendant has an interest, or of any competitor of TCC Wireless, LLC;

(C) An injunction temporarily, preliminarily, and permanently prohibiting Defendant during the period ending August 5, 2020 from diverting from TCC Wireless, LLC, or by aiding others, doing anything which would cause diversion from TCC Wireless, of any business with any past or present customer or supplier of TCC Wireless, LLC with whom Defendant had any contact or learned of during his employment;

(D) An injunction temporarily, preliminarily, and permanently prohibiting Defendant from using or disclosing any of TCC Wireless, LLC's Confidential Information;

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

(E) Damages to be proven a trial in the amount in excess of $75,000 to which TCC Wireless, LLC may be entitled; and

(F) Awarding such other and further relief that TCC Wireless may be entitled, to the extent permitted by applicable law, including its costs.

Date: August 29, 2019

Respectfully submitted,

**TCC WIRELESS, LLC**

By: /s/ Louis J. Phillips
One of its attorneys

Louis L. Phillips
Patzik, Frank & Samotny Ltd. (Firm ID: 35160)
200 South Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 551-8300
lphillips@pfs-law.com

Patrice S. Arend (IL. 6228772)
27777 Franklin Road, Suite 2500
Southfield, MI 48034
248.351.3000
parend@jaffelaw.com
*Attorneys for TCC Wireless, LLC*

# VERIFICATION

I, Eric S. Tarasievich on behalf of TCC Wireless, LLC, do swear and affirm as follows:

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in the Verified Complaint are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Dated: August 29, 2019

______________________, on behalf of TCC Wireless, LLC

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

# EXHIBIT A

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") is made and entered into as of December 1, 2016 (the "Effective Date") by and between TCC WIRELESS, LLC, a Delaware limited liability company (the "Company"), and KENNETH SILLER ("Executive").

## RECITALS:

A. The Company is engaged in the business of operating wireless phone retail stores and the sale of wireless phones, accessories and related products and services, as the Company determines from time to time (all such activities and services provided by the Company and any and all other businesses and operations in which the Company may hereafter engage are collectively hereinafter referred to as the "Business") to various individual and company customers of the Company (collectively, the "Customers").

B. The Company wishes to employ Executive as the Company's Senior Vice President-Sales and Marketing and desires to enter into an agreement with him setting forth the terms of such a relationship.

C. Executive has the knowledge, experience and expertise to serve in such capacity and desires to accept such employment with the Company on the terms and subject to the conditions set forth below.

## AGREEMENTS:

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

1. Employment. Subject to the terms, covenants and conditions set forth in this Agreement, the Company hereby agrees to employ Executive as the Company's Senior Vice President-Sales and Marketing, and Executive hereby accepts employment with the Company as its Senior Vice President-Sales and Marketing.

2. Term. Subject to the termination provisions set forth in Section 5 below, the term of Executive's employment with the Company under this Agreement shall commence on the Effective Date and shall continue until the first anniversary of the Effective Date (the "Initial Term"). At the conclusion of the Initial Term and any Renewal Term (as defined below) thereafter, and unless terminated earlier, this Agreement shall automatically extend for an additional one (1) year period, unless either party gives the other party written notice at least 60 days prior to the end of the then-current term of such party's intention not to renew this Agreement for the following annual period (each a "Renewal Term" and, collectively with the Initial Term, the "Term").

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

3. Capacity and Performance. Throughout the Term of this Agreement:

(a) Executive shall serve the Company as its Senior Vice President-Sales and Marketing on a full-time basis and shall perform such acts, duties and responsibilities consistent with his position on behalf of the Company, as are customarily done and performed by individuals holding such position in companies in similar businesses and of similar size to the Company, and such other duties as may be designated from time to time by the Company's Chief Executive Officer or Chief Financial Officer, to whom the Executive shall regularly report. The expenditure of reasonable amounts of time by Executive for personal, charitable or investment activities shall not be deemed a breach of this Agreement, provided that such activities do not interfere with the services required to be rendered by Executive under this Agreement and are not contrary to the interests of the Company.

(b) Executive shall devote his full business time and his reasonable best efforts, business judgment, skill and knowledge exclusively to the advancement of the business and interests of the Company and to the discharge of his duties and responsibilities hereunder.

4. Compensation and Benefits. As compensation for all services performed by Executive under this Agreement and during the Term:

(a) Base Salary. As compensation for the services to be performed under this Agreement, the Company shall pay to Executive, during the Term, an annual salary (the "Base Salary") at the rate of $245,000.00 per annum, less applicable deductions, payable in accordance with the Company's usual payroll practices.

(b) Monthly Performance Bonus. For each calendar month, commencing with December 2016, Executive shall be eligible to receive a monthly performance bonus (a "Performance Bonus") as follows:

i. Executive shall receive a Performance Bonus in the amount set forth on the attached Schedule A corresponding to the applicable Traffic Conversion Percentage for such month (for purposes hereof, "Traffic Conversion Percentage" means the traffic conversion percentage for the Company on a consolidated basis as reported by T-Mobile's Sharepoint System).

ii. In addition to any Performance Bonus earned under subsection i. above, Executive shall receive a $2,500 Performance Bonus for each month in which the Company achieves at least 125% of the Key Sales Objectives

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

No. 1 (KSO #1) established by T-Mobile for such month (as determined by T-Mobile through its DCS system and final commission report for such month) and Executive shall receive a $2,500 Performance Bonus for each month in which the Company achieves at least 125% of the Key Sales Objectives No. 2 (KSO #2) established by T-Mobile for such month (as determined by T-Mobile through its DCS system and final commission report for such month).

iii. Any earned Performance Bonus shall be paid in accordance with the Company's usual bonus/commission pay practices (typically within 60 days after the end of the calendar month for which the Performance Bonus was earned).

iv. Executive must be employed by the Company on the payment date to receive any Performance Bonus.

(c) One-Time Signing Bonus. The Company shall pay Executive a one-time signing bonus of $120,000.00, which shall be payable in equal quarterly increments of $30,000.00 (less applicable deductions) within fifteen (15) days after the beginning of each calendar quarter occurring in 2017.

(d) Paid Vacation Off. During the Term, Executive shall be entitled to four weeks of paid vacation off annually, to be taken at such times and intervals as shall be determined by Executive, subject to the reasonable business needs of the Company.

(e) Business Expenses. During the Term, the Company shall pay or reimburse Executive for reasonable, customary and necessary business expenses incurred or paid by him in the performance of his duties and responsibilities hereunder, subject to such reasonable substantiation and documentation as may be specified by the Company from time to time.

(f) Other Benefits. During the term hereof, Executive shall be entitled to participate in any and all employee benefit plans generally available from time to time to senior management level employees of the Company (and for which Executive qualifies under the terms of the plans). The Company may alter, modify, terminate, add to or discontinue the employee benefit plans that are from time to time in effect for its employees generally at any time as it, in its sole judgment, determines to be appropriate, without recourse by Executive.

5. Termination.

(a) Termination upon Death or Disability. Executive's employment under this Agreement shall terminate automatically upon Executive's death or if Executive becomes Disabled. For purposes of this Agreement, Executive shall be deemed to be "Disabled" if Executive becomes unable to perform the essential functions and responsibilities of his

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

position with reasonable accommodation, as required under the Americans with Disabilities Act, as the same has and may be amended (the "ADA"), by virtue of physical or mental disability, as defined under the ADA.

(b) Termination by the Company for Cause. During the Term, the Company may immediately terminate this Agreement for "Cause." For purposes of this Agreement, "Cause" shall mean, in each case as determined by the Company:

i. Executive's material breach of any of the terms, provisions or covenants contained in this Agreement which, after written notice from the Company of such breach, has not been cured within thirty (30) days after he receives such notice;

ii. Executive's conviction of or plea of guilty or *nolo contendere* to a felony, misdemeanor or other crime that either (A) involves moral turpitude, dishonesty, fraud, theft, embezzlement, or financial impropriety or (B) provides for a term of imprisonment;

iii. Executive's commission of any act or omission constituting misappropriation, unethical business conduct, disloyalty or breach of fiduciary duty which is injurious to the Company, the specific nature of which shall be set forth in a written notice by the Company to Executive;

iv. Executive's failure to adequately perform his duties, or failure to follow the reasonable instruction of the Company, which after written notice from the Company of such failure, has not been cured within thirty (30) days after he receives such notice;

v. Executive's misappropriation of funds or assets of the Company; or

vi. Executive fails to earn any Performance Bonus during a period of at least three (3) months in any consecutive twelve (12) month period.

(c) Termination by Executive for Good Reason. Executive may terminate his employment for Good Reason provided that (i) Executive has provided the Company with thirty (30) days' prior written notice setting forth in reasonable detail the basis for such Good Reason and (ii) the Company has not cured the Good Reason within such thirty (30) day period, in which case the Termination Date shall be the 30th day after Executive gave such notice The following shall constitute "Good Reason" for termination by Executive:

i. A material reduction of the Base Salary; or

ii. The material removal or diminution of the authority, responsibilities

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

or duties of Executive (other than any such authorities, duties or responsibilities assigned at any time which are by their nature, or which are identified at the time of assignment, as being temporary or short term).

No condition enumerated in the preceding sub-sections (i) and (ii) will be deemed to be Good Reason unless within 30 days of the initial existence of such condition, the Executive will have given the Company written notice thereof specifically describing the condition giving rise to Good Reason and allowing the Company a period of 30 days from the date of receipt of the notice to remedy such condition; and provided further, however, in no event will a condition give rise to Good Reason hereunder unless, within 60 days after the initial existence of such condition, the Executive will have actually terminated his employment with the Company by giving written notice of resignation for failure of the Company to remedy such condition.

(d) Termination under other Circumstances. During the Term, either the Company or the Executive may voluntarily terminate this Agreement upon thirty (30) days' advance written notice to the other party for any reason or no reason whatsoever; it being understood that Executive's employment is at-will.

6. Effect of Termination of Employment.

(a) Upon the termination of this Agreement for any reason, the Executive shall be entitled to, and the Company shall pay Executive, an amount equal to: (i) any earned but unpaid Base Salary covering the period of employment prior to the effective date of termination; and (ii) unreimbursed business expenses pursuant to Section 4 above. Except as otherwise specified in this Section 6(a) or Section 6(b) below, Executive shall not be entitled to any other compensation or benefits upon the termination of his employment with the Company for any reason whatsoever.

(b) If Executive is terminated by the Company without Cause or if Executive terminates his employment for Good Reason, then, subject to Executive signing and delivering to the Company (and not revoking) a general release in favor of the Company, in substantially the form attached hereto as Exhibit A, within 30 days following presentation thereof, and provided that Executive complies with the covenants set forth in Sections 7, 8, 9 and 12 below, in addition to the payments and benefits described in Section 6(a), the Company shall continue to pay Executive, in accordance with the Company's regular payroll practice, Executive's Base Salary for twelve (12) months, less applicable deductions (the "Severance Compensation"); provided, however, that: (i) the first payment of the Severance Compensation pursuant to this Section 6(b) shall be paid on the 60th day following Executive's termination of employment and shall include any amounts due prior thereto, and (ii) if Executive is terminated by the Company without Cause or if Executive terminates his employment for Good Reason prior to December 1, 2017, then the Severance Compensation shall only be paid for the balance of the Initial Term. For the avoidance of doubt, the Executive shall not be entitled to the payments

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

under this Section 6(b), if the Executive's employment is terminated as a result of the Executive's death, if the Executive becomes Disabled, if the Company terminates the Executive's employment for Cause, or if the Executive voluntarily terminates his employment with the Company without Good Reason.

7. Restrictive Covenants.

(a) *Terms.* The Company and Executive acknowledge and agree that for Executive to compete with the Company during the time the Executive is employed by the Company, and for a limited time thereafter, would be contrary to the purposes for which the parties entered into this Agreement. In order to induce the Company to enter into this Agreement, Executive covenants, warrants and agrees, for the benefit of the Company, its parents, subsidiaries, successors and assigns (collectively, the "Protected Parties"), that without first obtaining the express written consent of the Company, which may be granted or withheld in the Company's sole and absolute discretion, Executive shall not, either directly or indirectly:

i. during the period commencing on the Effective Date and ending upon the expiration of one (1) year from the date that Executive ceases to be employed by the Company or any of its Affiliates for any reason (the "Covenant Period"), engage, or compete with any Protected Party, in the Business, or any facet of the Business anywhere within the United States of America, as an employee, independent contractor or otherwise;

ii. during the Covenant Period, have any ownership interest in (whether as a shareholder, partner, member, associate, owner or otherwise), make any loan to or investment in, any corporation, partnership, limited liability company, association, trust, firm or other enterprise which is engaged in, or competes with, any Protected Party in the Business, or any facet of the Business, anywhere within the United States of America; provided, however, that notwithstanding the foregoing, Executive may invest in any publicly-held corporation engaged in the Business, if his aggregate investment does not exceed one (1%) percent in value of the issued and outstanding capital stock of such corporation;

iii. during the Covenant Period, divert from any Protected Party, or by aid of others, do anything which would cause diversion from any Protected Party, of any business with any Customer or supplier with which such Protected Party has any contact or association in connection with the Business; or

iv. during the Covenant Period, solicit, induce or attempt to induce, either directly or indirectly, any employee or independent contractor of any Protected Party, (A) to change his, her or its contractual relationship with any Protected Party, (B) to leave the employment of or terminate his, her or its contractual relationship with any Protected Party, or (C) enter into the employ of or a

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

contractual relationship with Executive, any entity in which Executive has any interest whatsoever, or any competitor of any of the Protected Parties.

(b) *Executive Representations.* Executive hereby represents and warrants to the Company that Executive is not in breach of any existing covenant not to compete, nonsolicitation agreement, confidentiality agreement or other substantially similar agreement, nor will Executive be in breach of any such agreement as a result of his employment with, or performance of services for, the Company.

(c) *Enforcement.* The covenants set forth in this Section 7 shall be a series of separate covenants, one for each and every state, county and other municipal division within the United States of America. The covenants set forth in this Section 7 are reasonable and valid in geographical and temporal scope and in all other respects. If any court determines that any covenant set forth in this Section 7, or any portion of any such covenant, is invalid or unenforceable, the remainder of the covenants set forth in this Section 7 shall not be affected and shall be given full force and effect, without regard to the invalid covenant or the invalid portion. If any court determines that any covenant set forth in this Section 7, or any portion of any such covenant, is unenforceable because of its duration or geographic scope, such court shall have the power to reduce such duration or scope, as the case may be, and to enforce such covenant or portion in such reduced form. The Company and Executive confer jurisdiction to enforce the covenants set forth in this Section 7 on the courts of any jurisdiction within the geographical scope of such covenants. If the courts of any one or more of such jurisdictions hold the covenants set forth in this Section 7, or any portion of any such covenant, unenforceable by reason of the breadth of such scope or otherwise, such determination shall not bar or in any way affect the right of any of the Protected Parties to the relief provided in the courts of any other jurisdiction within the geographical scope of such covenants as to breaches of such covenants in such other respective jurisdictions.

8. Intellectual Property Rights.

(a) *Assignment of Inventions.* Executive recognizes that he may, individually or jointly with others, discover, conceive, make, perfect or develop inventions, discoveries, new contributions, concepts, ideas, developments, processes, formulas, methods, compositions, techniques, articles, machines and improvements, and all original works of authorship and all related know-how, whether or not patentable, copyrightable or protectable as trade secrets for and on behalf of the Company pursuant to this Agreement ("Inventions"). Executive agrees that all such Inventions are the sole and exclusive property of the Company, all to the extent any such Inventions are capable of ownership under applicable law. EXECUTIVE AGREES THAT ANY PARTICIPATION BY HIM IN A COPYRIGHTABLE WORK IS A WORK MADE FOR HIRE, AS DEFINED IN TITLE 17, UNITED STATES CODE, TO THE EXTENT PERMITTED BY LAW FOR THE SOLE AND EXCLUSIVE BENEFIT OF THE COMPANY AND EXECUTIVE HEREBY ASSIGNS TO THE COMPANY ALL OF HIS RIGHTS IN AND TO SUCH INVENTIONS. Executive shall maintain adequate and current written

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

records of all Inventions, which shall remain the property of the Company, as applicable and be available to the Company at all times. At the Company's request Executive shall promptly sign and deliver all documents necessary to vest in the Company, all right, title and interest in and to any Inventions. If the Company is unable, after reasonable effort, to secure Executive's signature on any document needed to vest in the Company all right, title and interest in and to any Inventions, whether because of Executive's physical or mental incapacity or for any other reason whatsoever, Executive hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Executive's agent and attorney-in-fact, to act for and in Executive's behalf and stead to execute and file any such document and to do all other lawfully permitted acts to further the prosecution and enforcement of patents, copyrights or similar protections with the same legal force and effect as if executed by Executive.

(b) *Third Party Intellectual Property*. Executive hereby represents and warrants that he is not a party or subject to any agreements or other arrangements protecting the trade secrets or other intellectual property of any third-party.

9. Confidentiality. In order to facilitate the provision of Executive's services to the Company under this Agreement, the Company has disclosed and will disclose information it considers proprietary and confidential. This information may include, without limitation: (a) business, financial, marketing and operational plans; (b) forecasts and projections; (c) sales plans and data; (d) information which relates to the Company's proprietary products, prototypes, or plans; (e) customer lists and information; (f) the Company's listing information; and (g) other information whether or not identified as confidential of a confidential and non-public nature (collectively, "Confidential Information"); provided, however, that Confidential information shall not include any information: (x) prior to the Effective Date, was generally publicly available; (y) becomes publicly available without fault of or action on the part of Executive; or (z) is acquired by Executive following the cessation of his employment with, or as a member of, the Company from a third party (other than a Protected Party), free of any restrictions as to its disclosure. In connection therewith, the parties agree that:

(a) Executive agrees to hold the Confidential Information in the strictest confidence. Executive will not disclose the Confidential Information to any third party.

(b) Executive will not, at any time, use the Confidential Information in any fashion, form, or manner, except to facilitate the provision of services by Executive on behalf of the Company.

(c) Confidential Information may not be copied or reproduced without the Company's prior written consent.

(d) Confidential Information shall at all times remain the sole property of the Company. Executive shall have no license, ownership rights, or any other rights or interests in the Confidential Information. Confidential Information disclosed by the Company, including copies thereof, shall be returned to the Company by Executive upon

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

request by the Company; provided, however, that upon termination of this Agreement, Executive shall return any Confidential Information within ten (10) days of such termination, without any request by the Company being necessary or required.

10. Specific Performance. In the event of a breach or attempted breach of any of the covenants set forth in Section 7, Section 8 or Section 9, in addition to any and all legal and equitable remedies immediately available, such covenants may be enforced by a temporary and/or permanent injunction. The parties agree that the remedy at law for a breach or threatened breach of any of the covenants set forth in Section 7, Section 8 or Section 9 would be inadequate.

11. Key Man Insurance. Executive agrees that the Company may obtain a "key man" life insurance policy on Executive's life, at the Company's sole expense and with the Company as the sole beneficiary thereof. Executive shall (i) cooperate fully with the Company in obtaining such life insurance, (ii) sign any necessary consents, applications and other related forms or documents, and (iii) take any required medical examinations.

12. Cooperation. Following termination of the Executive's employment for any reason, at the request of the Company, (i) the Executive shall, during the three month period following termination of employment, (A) cooperate with the Company in transitioning his duties and activities on behalf of the Company to one or more executives of the Company, and (B) provide information and other assistance relating to the business operations and activities of the Company to representatives of the Company, as requested by the Company; and (ii) the Executive shall cooperate with the Company in connection with any litigation or regulatory matters in which the Executive may have relevant knowledge or information. The Company shall reimburse the Executive for the reasonable expenses and costs incurred by him in connection with such cooperation and assistance.

13. Indemnification. Subject to limitations imposed by law, the Company shall indemnify and hold harmless Executive to the fullest extent permitted by law from and against any and all claims, damages, expenses (including reasonable attorneys' fees), judgments, penalties, fines, settlements, and all other liabilities actually and reasonably incurred or paid by him in connection with the investigation, defense, prosecution, settlement or appeal of any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and to which Executive was or is a party or is threatened to be made a party by reason of the fact that Executive is or was an officer, employee or agent of the Company, or by reason of anything done or not done by Executive in any such capacity or capacities, provided that Executive complied with his obligations under this Agreement, Executive acted in good faith, in a manner that was not grossly negligent or constituted willful misconduct and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The Company also shall pay any and all expenses (including reasonable attorney's fees) incurred by the Executive as a result of the Executive being called as a witness in connection with any matter involving the Company and/or any of its officers or managers.

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

14. Notices. All notices, requests, consents and other communications, required or permitted to be given under this Agreement shall be personally delivered in writing or shall have been deemed duly given when received after it is posted in the United States mail, postage prepaid, registered or certified, return receipt requested addressed as set forth below. In addition, a party may deliver a notice via another reasonable means that results in the recipient party receiving actual notice, as conclusively demonstrated by the party giving such notice.

If to the Company:

TCC Wireless, LLC
565 Randy Road
Carol Stream, Illinois 60188
Email: jay@tccmobile.com
Fax:
Attn: Mr. Javed Malik

If to Executive:

Kenneth Siller
10535 Keller Road
Clarence, New York 14031
Email: ksiller@hotmail.com
Fax: ___________________

15. Miscellaneous.

(a) The failure of any party to enforce any provision or protections of this Agreement shall not in any way be construed as a waiver of any such provision or provisions as to any future violations thereof, nor prevent that party thereafter from enforcing each and every other provision of this Agreement. The rights granted the parties herein are cumulative and the waiver of any single remedy shall not constitute a waiver of such party's right to assert all other legal remedies available to it under the circumstances.

(b) This Agreement has been executed in, and shall be construed and enforced in accordance with the laws of the State of Illinois, without regard to the conflict of law rules of such state. The state and federal courts sitting in the state of Illinois shall have exclusive jurisdiction over any and all disputes arising out of or relating to this Agreement. Each party to this Agreement irrevocably and unconditionally (i) consents to the exclusive jurisdiction of such courts in respect of any action, suit or proceeding arising out of or relating to this Agreement, (ii) waives any defense of lack of personal jurisdiction in such courts in respect of any action, suit or proceeding arising out of or relating to this Agreement, and (iii) waives any objection to the laying of venue of any action, suit or proceeding arising out of or relating to this Agreement.

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

(c) The provisions of this Agreement are severable and if anyone or more provisions may be determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions and any partially unenforceable provision to the extent enforceable in any jurisdiction nevertheless shall be binding and enforceable.

(d) This Agreement sets forth the entire understanding and agreement of Executive and the Company with respect to its subject matter and supersedes all prior understandings and agreements, whether written or oral, in respect thereof. No modification, termination or attempted waiver of this Agreement shall be valid unless in writing and signed by the party against whom the same is sought to be enforced.

(e) The rights and obligations of Company under this Agreement shall inure to the benefit of, and shall be binding on, Company and its successors and assigns. This Agreement is personal to Executive and he may not assign his obligations under this Agreement in any manner whatsoever and any purported assignment shall be void. For all purposes under this Agreement, the term "Company" shall include any successor to Company's business and/or assets that assume the Company's rights and obligations under this Agreement.

(f) The headings and captions used in this Agreement are for convenience of reference only and shall not be considered in interpreting this Agreement.

(g) Each party expressly represents and warrants to each other that: (i) before executing this Agreement, such party has fully informed itself of the terms, contents, conditions and effects of this Agreement; (ii) such party has relied solely and completely upon its own judgment in executing this Agreement; (iii) such party has been advised to and has had the opportunity to seek the advice of counsel before executing this Agreement; (iv) such party, whether or not it chose to seek the advice of counsel, has acted voluntarily and of its own free will in executing this Agreement; (v) such party, whether or not it chose to seek the advice of counsel, is not acting under duress, whether economic or physical, in executing this Agreement; and (vi) and such party, if it chose not to seek the advice of counsel, shall not raise any claims against the enforcement of this Agreement that arise from its decision not to do so.

(h) This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document, and copies (facsimile, photostatic, electronic or otherwise) of signatures to this Agreement shall be deemed to be originals and may be relied upon to the same extent as though such copy, fax or electronically transmitted signature was an original.

(i) Any payments provided for in this Agreement shall be paid net of any applicable income tax withholding required under federal, state or local law.

16. Survival. Sections 6, 7, 8, 9, 10, 12 and 13 will survive and continue in full force in accordance with their terms notwithstanding any termination of this Agreement.

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

17. Section 409A. It is intended that this Agreement will be exempt from, or comply, with Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") and any regulations and guidelines promulgated thereunder (collectively, "Section 409A"), and the Agreement shall be interpreted on a basis consistent with such intent. No action or failure to act pursuant to this Section 17 shall subject the Company to any claim, liability, or expense, and the Company shall not have any obligation to indemnify or otherwise protect Executive from the obligation to pay any taxes, interest or penalties pursuant to Section 409A. Notwithstanding any provision to the contrary in this Agreement, if Executive is deemed on the date of his "separation from service" (within the meaning of Treas. Reg. Section 1.409A-1(h)) with the Company to be a "specified employee" (within the meaning of Treas. Reg. Section 1.409A-1(i)), then with regard to any payment or benefit that is considered deferred compensation under Section 409A payable on account of a "separation from service" that is required to be delayed pursuant to Section 409A(a)(2)(B) of the Code (after taking into account any applicable exceptions to such requirement), such payment or benefit shall be made or provided on the date that is the earlier of (i) the expiration of the six (6)-month period measured from the date of Executive's "separation from service," or (ii) the date of Executive's death (the "Delay Period"). Upon the expiration of the Delay Period, all payments and benefits delayed pursuant to this Section 17 (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to Executive in a lump sum and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein. Notwithstanding any provision of this Agreement to the contrary, for purposes of any provision of this Agreement providing for the payment of any amounts or benefits upon or following a termination of employment that are considered deferred compensation under Section 409A, references to Executive's "termination of employment" (and corollary terms) with the Company shall be construed to refer to Executive's "separation from service" (within the meaning of Treas. Reg. Section 1.409A-1(h)) with the Company. Whenever payments under this Agreement are to be made in installments, each such installment shall be deemed to be a separate payment for purposes of Section 409A.

*[Signatures on following page]*

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

**IN WITNESS WHEREOF,** the parties have executed this Employment Agreement as of the day and year first above written.

**COMPANY:**

TCC WIRELESS, LLC, a Delaware limited liability company

By: [signature]

Print Name: JAVED MALIK.

Its: CEO.

**EXECUTIVE:**

[signature]

KENNETH SILLER

[Signature Page to Employment Agreement]

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

**Exhibit A**
Form of Release

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Kenneth Siller ("Executive") hereby delivers this Release ("Release") to TCC Wireless, LLC, a Delaware limited liability company (the "Employer") in connection with the termination of Executive's employment with Employer and its subsidiaries. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in that certain Employment Agreement dated as of December 1, 2016, by and between Employer and Executive (the "Employment Agreement").

1. Executive Release of Rights. Except for the payments to be made following the Termination Date to Executive pursuant to Section 6 of the Employment Agreement, Executive (defined for the purpose of this Section 1 as Executive and Executive's agents, representatives, attorneys, assigns, heirs, executors, and administrators) fully and unconditionally releases Employer, its subsidiaries and each of its respective past or present employees, agents, insurers, attorneys, administrators, officers, directors, shareholders, members, managers, parents, predecessors, successors, employee benefit plans, and the sponsors, fiduciaries, or administrators of Employer's employee benefit plans (collectively, the "Released Parties") from, and agrees not to bring any action, proceeding, or suit against any of the Released Parties regarding, any and all liabilities, claims, demands, actions, causes of action, suits, grievances, debts, sums of money, agreements, promises, damages, back and front pay, costs, expenses, attorneys' fees, and remedies of any type, from the beginning of time to the date hereof, including, without limitation, any liability arising or that may have arisen out of or in connection with Executive's employment with, or termination of employment from, Employer, including, but not limited to, claims, actions or liabilities under (1) Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Civil Rights Act of 1866, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Fair Labor Standards Act, the Family and Medical Leave Act, the Worker Adjustment and Retraining Notification Act, the Older Workers Benefit Protection Act, and the Employee Retirement Income Security Act of 1974; (2) any other federal, state or local statute, ordinance, or regulation regarding employment, termination of employment, or discrimination in employment, and (3) the common law of any state relating to employment contracts, wrongful discharge, defamation, or any other matter, provided, however, that Executive is not releasing, and is not agreeing to forego bringing any action, suit or proceeding regarding (A) any claim that cannot be legally released, (B) any claim based upon any vested benefits Executive may have under any employee welfare benefit plan of Employer or its subsidiaries, or (C) any of his rights under this Release.

2. Waiver of Reinstatement. Executive waives any reinstatement or future employment with Employer or its subsidiaries and agrees never to apply for employment or otherwise seek to be hired, rehired, employed, re-employed, or reinstated by Employer or any of its subsidiaries.

3. Severability. The provisions of this Release shall be severable and the invalidity of any provision shall not affect the validity of the other provisions; provided, however, that upon a finding by a court of competent jurisdiction that any release in Section 1 above is illegal, void

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

or unenforceable, Executive agrees to execute promptly a release and covenant that is legal and enforceable.

4. Governing Law. This Release shall be governed by and construed in accordance with the laws of the State of Illinois without regard to conflicts of laws principles that would cause any state's laws, other than the laws of the State of Illinois, to apply.

5. Scope of Release. Executive understands that he remains bound to those provisions in his Employment Agreement that survive the termination of his employment in accordance with Section 7, 8 and 9 thereof. Except as specifically set forth in such provisions, this Release contains the entire agreement and understanding between Executive and Employer concerning the matters described herein, and supersedes all prior agreements, discussions, negotiations, understandings and proposals of the parties. The terms of this Release cannot be changed except in a subsequent document signed by both parties.

6. Revocation Period. Executive has the right to revoke this Release solely with regard to his release of claims under the Age Discrimination in Employment Act and the Older Workers Benefit Protection Act for up to seven (7) days after he signs it. In order to revoke this Release, Executive must sign and send a written notice of the decision to do so, addressed to Employer, and that written notice must be received by Employer no later than the eighth (8th) day after Executive signed this Release. If Executive revokes this Release, Executive will not be entitled to any consideration from Employer described in Section 6 of the Employment Agreement.

7. Knowing and Voluntary Waiver. Executive acknowledges that:

a. Executive has carefully read this Release and fully understands its meaning;

b. Executive had the opportunity to take up to 21 days after receiving this Release to decide whether to sign it;

c. Executive understands that Employer is hereby advising him, in writing, to consult with an attorney before signing it;

d. Executive is signing this Release, knowingly, voluntarily, and without any coercion or duress; and

e. Everything Executive is receiving for signing this Release is described in the Employment Agreement or this Release and no other promises or representations have been made to cause Executive to sign it.

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

IN WITNESS WHEREOF, Executive has executed this Release as of the date below.

EXECUTIVE:

Dated: 11/30/16

Kenneth Siller

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

## SCHEDULE A

Traffic Conversion Bonus

| **Traffic Conversion Percentage** | **Performance Bonus** |
|---|---|
| Less than 9% | 0 |
| At least 9% but less than 10% | $5,000.00 |
| At least 10% but less than 10.5% | $7,500.00 |
| At least 10.5% but less than 11% | $12,000.00 |
| At least 11% but less than 11.5% | $15,000.00 |
| At least 11.5% but less than 12% | $17,500.00 |
| At least 12% | $20,000.00 |

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

# EXHIBIT B

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

**From:** Andrea Sealey <asealey@expmgnt.com>
**Date:** Tuesday, August 20, 2019 at 8:57 AM
**To:** Andrea Sealey <asealey@expmgnt.com>
**Subject:** IMPORTANT Organizational Announcement

**[External]**



August 20, 2019

At Express, we are committed to the continued growth of our employees and the company as a whole. We are always looking for new ways to bring both our employees and our company to the Next Level while not losing sight of our Employee First initiatives. It is in the spirit of continued growth and positioning ourselves to be in the best spot for potential expansion that Express Stores is excited to announce the following organizational changes that will go into effect on Monday, August 26, 2019.



**Ryan Warner**: Ryan has been with Express since joining as the Vice President of Sales in 2012. In 2017, Ryan was promoted to Chief Operating Officer, leading the way through multiple growth and expansion opportunities while overseeing the day to day operations of the

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

company. He has championed many initiatives to continue to put Express in a position for further growth while balancing the direct oversight of the Sales department and strategic oversight for the entire organization. Beginning Monday, August 26, Ryan will assume a new role as the **Chief Executive Officer** for Express Stores. This new role will allow him to focus his energy and leadership on taking Express Stores to the next level. Ryan's passion for an Employee First culture will remain unwavering as he leads the company's strategic growth initiatives and continues to find new ways to make Express Stores an even greater place to work!



**Phil Speiser:** Phil joined Express in May of 2014 as the Vice President of Operations. In 2017, Phil was promoted to Senior Vice President of Operations. During his time with Express, Phil has overseen the growth of the operations team to include Operations Manager support for each market, multiple layers of leadership within the department, the evolution of the Loss Prevention team, and the addition of entirely new departments such as the Reporting and Analytics team. Phil has been an invaluable asset to the operational side of our business during his tenure with Express. On Monday, August 26, Phil will assume a new role as **Chief Operations Officer.** In this new capacity, Phil will continue to oversee the Operations of the business, focusing on new possibilities to develop relevant, more efficient processes and procedures for more streamlined operations to support and protect the company assets.



**Ken Siller:** Express Stores is pleased to welcome Ken to the Express family as **Chief Revenue Officer**. Ken brings with him over 12 years of experience in the Telecom industry, dating back to a start in 2007. He has lead sales teams in T-Mobile and other large partners driving tremendous results and is excited to bring that expertise to Express. Ken understands and values people and is looking to use his passion and experiences to continue to build on our Employee First culture. Ryan Warner previously worked with Ken and has said, "Ken is one of the best leaders I have ever had the pleasure of working with, and I am excited about the potential for Express under his leadership." Ken is a father of four and resides in Buffalo, NY. In his spare time, he is an avid snowmobiler. We look forward to all that Ken will bring to Express to take our sales teams to the next level as he begins his new position on Monday, August 26.

**Andrea Sealey**

FILED DATE: 8/29/2019 11:30 AM 2019CH10028

**Director of Communications and Employee Development**
**Express Stores** | 158 Tices Lane, East Brunswick NJ 08816
p 757-232-7735 | e Andrea.Sealey@T-Mobile.com |

**Connect with Us:**

Express Stores

"We are a team of dynamic wireless leaders that cultivate success through integrity and the commitment to exceed customer expectations to deliver exceptional results"

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the system manager or sender. This message contains confidential information and is intended only for the individual named. If you are not the named individual you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this in error and delete this e-mail from your systems. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

Return Date: No return date scheduled
Hearing Date: 12/27/2019 10:00 AM - 10:00 AM
Courtroom Number: 2410
Location: District 1 Court
Cook County, IL

FILED
8/29/2019 2:56 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019CH10028

6386906

FILED DATE: 8/29/2019 2:56 PM 2019CH10028

**IN THE CIRCUIT COURT OF COOK COUNTY**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

TCC WIRELESS, LLC, a Delaware limited liability company,

Plaintiff,

v.

KENNETH SILLER, an individual,

Defendant.

Case No.: 2019 CH 10028

## NOTICE OF EMERGENCY MOTION

To: Kenneth Siller
c/o Jennifer M. Levanchy, Esq.
General Counsel
Express Stores
158 Tices Lane
East Brunswick NJ 08816

**PLEASE TAKE NOTICE** that on **September 4, 2019 at 1:30 p.m.,** or as soon thereafter as counsel may be heard, I shall appear before the **Honorable Anna M. Loftus**, or any judge sitting in his stead, in **Courtroom 2410** of the Richard J. Daley Center, 50 W. Washington, Chicago, Illinois, and shall then and there present **Plaintiff's Verified Emergency Motion for Temporary Restraining Order and Preliminary Injunction,** a copy of which is hereby served upon you.

**TCC WIRELESS, LLC**

By: /s/ Louis J. Phillips
One of his attorneys

Louis J. Phillips (lphillips@pfs-law.com)
Patzik, Frank & Samotny Ltd.
200 S. Wacker Drive, Suite 2700
Chicago, IL 60606
312/551-8300
312/551-1101 (Fax)
Firm ID #35160

PFS:PERSONAL.MS.2166362.1

FILED DATE: 8/29/2019 2:56 PM 2019CH10028

## CERTIFICATE OF SERVICE

The undersigned, a non-attorney, under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, certifies that a copy of this **Notice of Emergency Motion** and **Plaintiff's Verified Emergency Motion for Temporary Restraining Order and Preliminary Injunction** was served upon:

Kenneth Siller
c/o Jennifer M. Levanchy, Esq.
General Counsel
Express Stores
158 Tices Lane
East Brunswick NJ 08816
p 732-608-8926
JLevanchy@expmgnt.com

via email to the email address set forth above, on this 29th day of August, 2019.

/s/ Melissa A. Siedlecki

Return Date: No return date scheduled
Hearing Date: 12/27/2019 10:00 AM - 10:00 AM
Courtroom Number: 2410
Location: District 1 Court
Cook County, IL

FILED
8/29/2019 1:08 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019CH10028

6383252

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | | |
|---|---|---|
| **TCC WIRELESS, LLC**, a Delaware limited Liability company, | ) | |
| | ) | Case No.: 2019 CH 10028 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| **Kenneth Siller**, an individual, | ) | |
| | ) | |
| Defendant. | ) | |

# MEMORANDUM IN SUPPORT OF VERIFIED EMERGENCY MOTION FOR TRO AND PRELIMINARY INJUNCTION

Plaintiff TCC Wireless, LLC. ("TCC Wireless"), through its undersigned counsel, submits the following brief in support of its Emergency Motion for TRO and Preliminary Injunction.

## Introduction

TCC Wireless filed a Verified Complaint seeking, among other things, injunctive relief arising out of the breach of non-compete, non-solicitation and confidentiality provisions in an employment agreement entered into between it and its now former employee and high level executive Kenneth Siller ("Defendant").

Defendant made an unequivocal promise, for which he was adequately compensated (including a significant signing bonus), not to compete with his employer, steal its confidential information, or take its employees after he ceased being employed. He quit of his own volition, and immediately went to work for a direct competitor. Shortly thereafter, Defendant was involved in soliciting TCC Wireless' employees. Defendant broke his contract. He working for a direct competitor in the exact market and geographic area where TCC Wireless operates. He also is soliciting TCC Wireless' employees a critical asset in this industry. Unless this Court enters the requested TRO and preliminary injunction, TCC Wireless will be irreparably harmed.



PFS:007509.0006.2166758.4

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

## Statement of Facts

### *TCC Wireless*

TCC Wireless is an authorized independent dealer for T-Mobile, USA, Inc. TCC Wireless has retail stores that sell both cellular phones and related accessories and cellular phone plans, among other things, for T-Mobile. (V. Compl. ¶6, **Exhibit 1**.) TCC Wireless has offices and retail stores in Illinois, as well as the following thirteen other states: Connecticut, Florida, Georgia, Indiana, Iowa, Massachusetts, New York, New Jersey, Ohio, Pennsylvania, Rhode Island, South Carolina, and Wisconsin. (*Id.*¶7.)

### *The Cellular Phone Industry*

The wireless and cellular phone industry is very competitive, and consists of many components: cell phone technology, cell phone manufacturing, cell phone service and retails sales. Several companies, including Defendant's current employer Express Stores, LLC ("Express Stores"), compete with TCC Wireless in the very same market for the very same customers and the same sales channels. (V. Compl. ¶8.) Like TCC Wireless, Express Stores also operates in the east coast market and has retail stores in New Jersey, Massachusetts, Pennsylvania, South Carolina and Florida. (*See* Express Stores locations, **Exhibit 2**.) TCC Wireless spends substantial resources of time and hundreds of thousands of dollars to develop, cultivate and retain favorable relationships with its customers, to identify valuable market space, and to identify potential opportunities for business growth. (V. Compl. ¶9.) For these reasons, executives within the cellular phone retail industry are particularly competitive, as retail operators are constantly seeking information regarding expansion and market opportunities. (*Id.* ¶8.)

### *The Employment Agreement*

On December 1, 2016, TCC Wireless hired Defendant as its Senior Vice President of Sales and Marketing. (Id. ¶10.) This is a high level executive position which involves strategic planning

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

for retail sales within the cellular phone industry. (Id. ¶10.) Because of Defendant's background and unique talent in the cellular phone industry, TCC Wireless hired Defendant to expand its business. Defendant was handsomely compensated for this position. TCC Wireless provided Defendant a signing bonus and one of the highest salaries in the business. (*Id.* ¶23.)

In exchange for unusually high compensation, Defendant negotiated and agreed to an Employment Agreement that contained restrictive covenants. (Id. ¶¶11, 23.); the "Agreement," **Exhibit 3.**) Defendant negotiated its terms with TCC Wireless. (Id. ¶11.) Defendant acknowledged he fully understood the Agreement and was encouraged to seek independent legal counsel before he voluntarily signed and agreed to its terms. (Agreement ¶ 15(g), Ex. 3.)

**Non-Compete Provision**

The Agreement contains, among other things, a reasonable one year non-compete provision, which provides, in relevant part:

> [D]uring the period commencing on the Effective Date [December 1, 2016] and ending upon the expiration of one (1) year from the date that Executive ceases to be employed by the Company or any of its Affiliates for any reason (the "Covenant Period"), engage, or compete with any Protected Party, in the Business, or any facet of the Business anywhere within the United States of America, as an employee, independent contractor or otherwise;

(*Id.*¶ 7(a)(i), Ex. 3.) The "Business" relates to the operations of retail stores, and is defined as "operating wireless phone stores and the sale of wireless phones, accessories and related products and services, as the Company determines from time to time (all such activities and services provided by the Company and any and all other businesses and operations in which the Company may hereafter engage)." (*Id.*, Recitals(A), Ex. 3.)

The non-compete provision is designed to protect TCC Wireless' reasonably competitive business information, including confidential information about its finances and business performance, its employee compensation and commission structure, its proprietary operational

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

technology platform, sales strategies, business plans, operations, market strategies, and strategies for growth and sales, including plans for target acquisitions. (V. Compl. ¶14.)

The Agreement also contains the following non-solicitation provisions:

**Non-Solicitation of Customers**

The Agreement provides, in relevant part, as follows:

> iii. during the Covenant Period divert from any Protected Party, or by aid of others, do anything which would cause diversion from any Protected Party, of any business with any Customer or supplier with which such Protected Party has any contact or association in connection with the business....

**Non-Solicitation of Employees**

> iv. during the Covenant Period, solicit, induce or attempt to induce, either directly or indirectly, any employee or independent contractor of any Protected Party, (A) to change his, her or its contractual relationship with any Protected Party, (B) to leave the employment of or terminate his, her or its contractual relationship with any Protected Party, or (C) enter into the employ of or a contractual relationship in which Executive [Siller] has any interest whatsoever, or any competitor of any of the Protected Parties.

(Agreement ¶ 7(a), Ex. 3.) This non-solicitation provision protects TCC Wireless' employment workforce from the possible poaching of employees with confidential information, protects costs associated with recruiting and hiring employees, ensures a stable workforce necessary for the stable growth of the business, and avoids an *en masse* of resignations. (V. Compl. ¶28.) Based on these covenants, TCC Wireless *introduced* Defendant to the rest of its management team, regional managers, district managers, and sales representatives. *Id.*

**Confidentiality Provision**

The Agreement contains a confidentiality provision defining Confidential Information:

> In order to facilitate the provision of Executive's [Siller's] services to the Company [TCC Wireless] under this Agreement, the Company has disclosed and will disclose information it considers proprietary and confidential. This information may include, without limitation: (a) business financial, marketing and operational plans; (b) forecasts and projections; (c) sales plans and data; (d) information which

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

> relates to the Company's proprietary products, prototypes or plans; (e) customer lists and information; (f) the Company's listing information; and (g) other information whether or not identified as confidential of a confidential and non-public nature (collectively "Confidential Information"); provided, however, that Confidential Information shall not include any information: (x) prior to the Effective Date, was generally publicly available; (y) becomes publicly available without fault of or action on the part of Executive; or (z) is acquired by Executive following the cessation of employment with, or as a member of, the Company from a third party (other than a Protected Party), free from any restrictions as to its disclosure.

(Agreement ¶ 9, Ex. 3.) The Agreement's confidentiality provision requires Defendant to safeguard TCC Wireless' Confidential Information. The Agreement further provides as follows:

> (a) Executive agrees to hold Confidential Information in the strictest confidence. Executive will not disclose the Confidential Information to a third party;
>
> (b) Executive will not, at any time, use Confidential Information in any fashion, form, or manner, except to facilitate the provision of services by Executive on behalf of the Company;
>
> (c) Confidential Information may not be copied or reproduced without the Company's prior written consent;
>
> (d) Confidential Information shall at all times remain the sole property of the Company. Executive shall have no license, ownership rights, or any other rights or interests in the Confidential Information. Confidential Information disclosed by the Company, including any copies thereof, shall be returned to the Company by Executive upon request by the Company; provided, however, that upon termination of this Agreement, Executive shall return any Confidential Information within ten (10) days of such termination, without any request by the Company necessary or required.

(*Id.* ¶ 9, Ex. 3.)

Defendant agreed that the restrictions set forth in the restrictive covenant provisions of the Agreement, among others, are "reasonable and valid in geographical and temporal scope and in all other respect." (Id. ¶7(c), Ex. 3.) Defendant was also handsomely compensated for these covenants. (V. Compl. ¶23.) Based on these covenants, TCC Wireless introduced Defendant to its proprietary and unique internal operations, software, and back office operations. (*Id.*)

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

***Defendant's Employment with TCC Wireless***

As the Senior Vice President of Sales and Marketing, Defendant was in a position where TCC Wireless shared with him and he otherwise acquired confidential and proprietary information regarding, among other things, the following:

- its finances and business performance: Defendant received, among other things, regular financial reports on sales, earnings, business margins, employee compensation structures, employee commission structures, as well as details on TCC Wireless' proprietary operational technology platform;

- its business plans including, but not limited to, information regarding TCC Wireless' growth and sales strategy, including but not limited to TCC Wireless' plans to target in the next several years; and

- TCC Wireless's sales strategies, the performance of many of its retail stores through the country, including performances of individual employees.

(V. Compl. ¶19(a)-(c).) TCC Wireless relied on Defendant's agreement to be bound by the terms of the Agreement in sharing its Confidential Information with him. (*Id.* ¶20.)

Defendant agreed that if he violated the restrictive covenants, among other things, TCC Wireless would be entitled to injunctive relief. The Agreement provides:

> Specific Performance. In the event of a breach or attempted breach of any of the covenants set forth in Section 7, Section 8 or Section 9, in addition to any and all legal and equitable remedies immediately available, such covenants may be enforced by a temporary and/or permanent injunction. The parties agree that the remedy at law for a breach or threatened breach of any of the covenants set forth in Section 7, Section 8 or Section 9 would be inadequate.

(Agreement ¶ 10, *see also* ¶7(c) , Ex. 3.)

As the Senior Vice President of Sales and Marketing and high level executive, Defendant was privy to TCC Wireless' Confidential Information. Defendant worked with TCC Wireless' customers and sales channels with whom TCC Wireless maintains relationships nationwide. During the course of Defendant's employment with TCC Wireless, he became familiar with, among other things, the manner in which TCC Wireless operates, and its sensitive information

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

regarding its business such as its billing procedures, compensation structures, employee commission structure and payouts, proprietary operational technological platform, employment strategies, strategic growth plans, sales volumes, business profitability, weaknesses, as well as sales goals and targets, which apply to its stores nationwide. Defendant also became privy to TCC Wireless' growth strategies, including strategic markets and partners. (V. Compl. ¶22.)

Effective on or about August 5, 2019, Defendant voluntarily resigned from his position as Senior Vice President of Sales and Marketing with TCC Wireless. (*Id.* ¶24.)

***Defendant's Breach of Employment Agreement***

Immediately following his resignation, Defendant became employed by Express Stores, a direct competitor of TCC Wireless. (*Id.* ¶25; *see also* Announcement, **Exhibit 4**.) Like TCC Wireless, Express Stores is an authorized independent dealer for T-Mobile, USA, Inc. and is in same business as TCC Wireless. Express Stores is the second largest T-Mobile partner. It has retail stores in the same east coast markets as TCC Wireless. (*See* Express Stores website, Ex. 2.)

On August 21, 2019, TCC Wireless sent Defendant a cease and desist letter, demanding that he not work for the competitor Express Stores. (**Exhibit 5**.) Defendant, through counsel, responding both on his behalf and on behalf of Express Stores, stated, among other things, that Defendant was not going to leave his employment with Express Stores.

Not only is Defendant now representing Express Stores in competition with TCC Wireless, immediately after, and within a one-year period of terminating his employment with TCC Wireless, Defendant also is violating his non-solicitation obligations by seeking to convince TCC Wireless employees to leave their employment to work for Express Stores. On or about August 22, 2019, Defendant was involved in soliciting Michael Erra, an employee of TCC Wireless, to end his employment with TCC Wireless and to work for Express Stores. (V. Compl. ¶27.)

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

Further, Defendant currently retains the Confidential Information as part of his thoughts and mental impressions and, upon information and belief, his continued work with Express Stores will lead to the inevitable disclosure of the Confidential Information that are necessarily and permanently maintained as part of his thoughts and mental impressions. (*Id.* at ¶ 29.) If Defendant continues to violate the non-compete and non-solicitation provisions of his Agreement, TCC Wireless will suffer additional irreparable harm. Accordingly, TCC Wireless filed a Complaint against Defendant seeking, among other things, injunctive relief. TCC Wireless now asks this Court to maintain the status quo by entering a temporary restraining order and/or a preliminary injunction to enforce the narrowly crafted, non-compete and non-solicitation provisions in the Agreement, which Defendant voluntarily signed, pending resolution of this litigation.

***Procedural History***

On August 29, 2019, TCC Wireless filed the Complaint for breach of contract, seeking, in part, injunctive relief. TCC Wireless now moves for temporary injunctive relief to maintain the status quo while it pursues a final judgment enforcing the restrictive covenants of the Agreement.

**Argument**

The entry of a temporary restraining order or preliminary injunction is appropriate if the moving party can show that (1) it has a protectable interest, (2) there is a likelihood of success on the merits, (3) it will suffer irreparable injury if injunctive relief is not granted, and (4) its remedy at law is inadequate. *See e.g., Arpac Corp. v. Murray*, 226 Ill. App. 3d 65, 72 (1st Dist. 1992). To obtain a TRO, a plaintiff need only establish a "fair question" of whether these elements are satisfied. *Tierney v. Village of Schaumburg,* 182 Ill. App. 3d 1055, 1059-1060 (1st Dist. 1989); *Gold v. Ziff Communications Co.*, 196 Ill. App. 3d 425, 431 (1st Dist. 1989). When obtaining injunctive relief, Plaintiff need not conclusively establish its position with regard to the ultimate determination on the merits. Instead, it need only "raise a fair question as to the existence the right claimed, lead the



PFS:007509.0006.2166758.4

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

Court to believe [it] will be entitled to the relief prayed for if the proof and law sustain [its] allegations, and make it appear advisable that the positions of the parties remain the same until the merits of the case are considered." *Armour & Co. v. United American Food Processors, Inc.*, 37 Ill.App.3d 132, 137 (1st Dist. 1976). The balance of hardships to the parties must also support the injunctive relief requested. *Cross Wood Prods., Inc. v. Suter*, 97 Ill. App. 3d 282, 284 (1st Dist. 1981); *Weitekamp v. Lane*, 250 Ill. App. 3d 1017, 1022 (4th Dist. 1993) (only *prima facie* evidence required for temporary injunctive relief).

The above standards are relaxed in the context of a motion for a temporary restraining order. In particular, the probability of success on the merits is viewed more liberally.

> A trial Court should not refuse a Temporary Restraining Order merely because the Court may not be absolutely certain the [movants] ha[ve] the right that [they] claim. The [movants] [are] not required to present a case that would entitle [them] to judgment at trial. Rather, [they] need only show that [they] raise a fair question of the existence of [their] right and that the Court should preserve the status quo until it can decide the cause on its merits.

*West Suburban Hospital Medical Center v. Hynes*, 173 Ill.App.3d 847, 856-57 (1st Dist. 1998). Here, TCC Wireless is entitled to a TRO and preliminary injunction pursuant to this analysis.

## I. Illinois Law Governs the Resolution of this Dispute.

The Agreement is governed by Illinois Law. (Agreement ¶ 15(b), Ex. 3 ("This Agreement has been executed in, and shall be construed and enforced in accordance with the laws of the State of Illinois, without regard to the conflict of law rules of such state.") (emphasis added). Illinois courts respect a contract's choice of law provisions. *Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1185 (7th Cir. 1996).

## II. TCC Wireless Has a Strong Likelihood that It Will Prevail on the Merits of the Breach of Contract Claim.

Little dispute exists that TCC Wireless and Express Stores are competitors, or that Defendant violated the non-solicitation provision by soliciting a TCC Wireless employee. As



PFS:007509.0006.2166758.4

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

such, he has breached the terms of the Agreement. The sole issue, then, is whether the restrictive covenants in the Agreement are enforceable. Under Illinois law, post-employment restrictive covenants are enforceable if they are reasonable. A restrictive covenant is reasonable if it (1) is no greater than is required for the protection of a legitimate business interest of the employer, (2) does not impose undue hardship on the employee, and is not injurious to the public. *Reliable Fire Equip. Co. v. Arredondo*, 358 Ill. Dec. 322 (2011).

A. <u>The Agreement protects a legitimate business interest</u>.

Illinois has long recognized a company's right to protect its goodwill, clientele and confidential information and business through the use of restrictive covenants. *Oil Express National, Inc.v. P&F Express, Inc*, 1985 WL 3586 at *2 (N.D. Ill. 1985); *Abel v. Fox*, 274 Ill App. 3d 811, 819 (1995) (protectable interest in confidential information or in its existing relationships with customers). A business further has a protectable right in its existing and prospective business relationships with its clients, and the continued viability and success of its business. *See, e.g., Reliable Fire Equipment Co. v. Arredondo*, 965 N.E.2d 393, 401 (Ill. 2011); *Abel v. Fox*, 274 Ill. App. 3d 811, 819 (4th Dist. 1995) ("In Illinois, confidential information and customer relationships can be a protectable interest of an employer"). "To state the obvious, an employer bargains for a restrictive covenant out of a concern that an employee will in the future compete with the employer and capture the employer's traditional business." *Arthur J. Gallagher v. Roi*, No. 1-14-0786, 2015 Ill. App (1st) (1st Dist. 2015); *Corroon & Black of Illinois v. Magner*, 145 Ill. App. 3d 151, 162-64 (1st Dist. 1986) (injunctive relief "is customary" where former employee threatens to disclose or is likely to disclose confidential business information of the former employer or where former employee threatens to steal or solicit long-term client). "Where, by virtue of his employment, an employee obtains certain confidential information relating to bidding procedures and customer

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

requirements and acquires an advantage through representative contact with the trade in the area of their application, the employer has the right to protect himself from the disadvantageous use of that information." *Donald McElroy, Inc. v. Delaney*, 72 Ill. App. 3d 285 (1979).

For these reasons, "[u]nder some circumstances, 'a promise to refrain from competition is a natural and reasonable means of protecting a legitimate interest of the promise.'" *Reliable Fire Equip. Co.*, 358 Ill. Dec. 322 (quoting Restatement (Second) of Contracts § 188 cmt. B (1981).) "In the case of a post employment restraint, where the employer-promisee exacts from the employee a promise not to compete after termination of the employment, the restraint is usually justified on the ground that the employer has a legitimate business interest in restraining the employee from appropriating the employer's (1) confidential trade information, or (2) customer relationships. Included within these precepts are several factors for a court to consider." *Id.* "Whether a legitimate business interest exists is based on the totality of the facts and circumstance of the individual case. Factors to be considered in the analysis include, but are not limited to, the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions." *Cumulus Radio Corp. v. Olson*, 80 F. Supp. 3d 900 (C.D. Ill. 2015).

As it relates to the solicitation of TCC Wireless' employees, it has a reasonable interest in maintaining a stable work force. *Arpac Corp. v. Murray*, 226 Ill. App. 3d 65 (1992) (plaintiff's "interest in maintaining a stable work force" was sufficient to enforce non-solicitation of employee provision); *Integrated Genomics, Inc. v. Kyrpides*, No. 06 C 6706, 2010 WL 275672 at *10 (N.D. Ill. Jan. 26, 2010) (employer has a legitimate business interest in maintaining a stable workforce). TCC Wireless expends a substantial amount of resources training its employees and attempting to maintain a stable workforce. In the cellular phone industry, the stability of the work force is

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

important to continued growth and market expansion. *See, e.g., Arpac v. Murray*, 226 Ill. App. 3d 65, (1992) (enjoining former employee from soliciting former employer's senior salesman and management employees in violation of the non-solicitation covenants).

The non-compete provision in the Agreement protects a reasonable competitive business interest and is otherwise reasonable. TCC Wireless disclosed to Defendant its confidential training procedures, its internal marketing goals, its market share strategies, and the years of accumulated data upon which it was based. If Defendant is permitted to continue violating the restrictive covenants, TCC Wireless' will lose its competitive advantage.

There is no serious dispute that Defendant violated the Non-Competition provision of the Agreement. He is working for a competitor of his former employer in the same market area and is, upon information and belief, performing the same services. There is also no serious dispute that Defendant violated the Non-Solicitation provision of the Agreement through his involvement in the solicitation of a TCC Wireless employee to leave his employment to work for Express Stores. Defendant's knowledge of TCC Wireless' market growth strategies, as well as its plans about which employees would help it achieve its goals, among other things, gives Defendant and Express Stores an unfavorable advantage as Defendant can take the very confidential information that TCC Wireless shared with him to assist Express Stores in accomplishing the same goals.

B. The Agreement is Reasonable in Scope.

"A restrictive covenant in an employment agreement is generally held to be enforceable if it is reasonable in geographical and temporal scope and it is necessary to protect a legitimate business interest of the employer." *Millard Maintenance Service Co. v. Bernero*, 207 Ill. App. 3d 736 (1990). Courts will also consider the unique facts and circumstances of the case when

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

determining the reasonableness of a restrictive covenant. *Shapiro v. Regent Printing Co.*, 192 Ill. App. 3d 1005, 1009 (1989).

Here, Defendant had a relatively high level position at TCC Wireless that gave him access to inside information and trade secrets. He was the Senior Vice President of Sales and Marketing, in charge of ALL TCC Wireless sales and marketing strategies, and strategic goals in growing its business (including overseeing 1,500 employees). (V. Compl. ¶10.) To protect that information, TCC Wireless required Defendant to execute an Agreement with restrictive covenants because any subsequent employment in the retail cellular industry would necessarily involve Defendant inevitably using TCC Wireless' confidential information. TCC Wireless paid Defendant $120,000 upon signing the Agreement and an average of $400,000-$450,000 per year in compensation, significantly higher than virtually any other employee in the wireless industry. (V. Compl. ¶23.) Under these circumstances, the non-compete provision is reasonable.

Further, with respect to geographic area, the courts particularly look to whether the restricted area is co-extensive with that in which the employee is doing business. *Wessel Co. v. Busa*, 28 Ill. App. 3d 686 (1975). Defendant, as the Senior Vice President of Sales and Marketing, did business on behalf of TCC Wireless throughout fourteen states in the Midwest and the east coast. Although the covenants contain no geographic limitation, the restrictions imposed by the covenants necessarily pertain to the area over which Defendant was responsible. *Wolf & Co. v. Waldron*, 51 Ill. App. 3d 239 (1977). Defendant had a choice. He could have gone to a market where TCC Wireless does not operate—such as the West Coast, Southwest United States, or the Great Plains. Yet, he chose to obtain employment in the very geographic and sales markets in which TCC Wireless operates and with another T-Mobile dealer (not another carrier such as Verizon, AT&T or Sprint) competing directly against TCC Wireless for its market share.

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

Alternatively, Defendant could wait one year. Defendant's high compensation level provides him with the ability to find a non-competitive position for a year before reentering the retail cellular business. Instead, he chose to immediately violate his contract.

The covenant in *Gorman Publishing Co. v. Stillman*, 516 F. Supp. 98 (N.D. Ill. 1981), for example, provided the defendant could not "directly or indirectly engage in a business directly competitive with Company anywhere in the United States or the foreign areas where the Company has done business." *Id.* at 101. The court held the provision was reasonably drawn to protect plaintiff's interest because the defendant had "considerable knowledge" about plaintiff's business:

> The [defendant's] intimate understanding of [plaintiff's] business gave [his new employer] an unjustified competitive advantage. Certainly the Illinois Courts have been willing to enforce non-compete clauses under closely analogous circumstances. *Id.*

With regard to the time limitation, the Agreement only contains a one-year limitation. This one-year restriction is well within the established parameters for covenants not to compete in Illinois. Courts have enforced restrains of longer duration. *See, e.g., Donald McElroy, Inc. v. Delaney*, 72 Ill. App. 3d 285 (1979) (enforcing three-year restriction).

Even assuming *arguendo* that the activity restriction was overboard, this Court is permitted to modify it under Section 7(c) of the Agreement. That provision provides:

> <u>Enforcement</u>. . . . If any court determines that any covenant set forth in this Section 7, or any portion of any such covenant, is invalid or unenforceable, the remainder of the covenants set forth in this Section 7 shall not be affected and shall be given full force and effect, without regard to the invalid covenant or the invalid portion. If any court determines that any covenant set forth in this Section 7, or any portion of any such covenant, is unenforceable because of its duration or geographic scope, such court shall have the power to reduce such duration or scope, as the case may be, and to enforce such covenant or portion in such reduced form. . . .

(Agreement ¶ 7(c).) Consistent with this contractual provision, Illinois courts will also modify a restrictive covenant and enforce the modified agreement. *See, e.g., Joy v. Hay Group, Inc.*, No.

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

02-C-4989, 2003 WL 22118930 (N.D. Ill. Sept. 11, 2003) (applying blue pencil doctrine to modify the geographic and activity restriction it found to be overbroad).

### III. TCC Wireless Faces Immediate and Irreparable Harm.

Illinois recognizes that ongoing competition itself as a sufficient basis for relief. *See, e.g., Gold v. Ziff Communications Co.*, 196 Ill. App. 3d 425, 434 (1989) ("The failure of plaintiff to show an actual loss is dispositive."); *U-Haul Co. v. Hindahl*, 90 Ill. App. 3d 572, 577 (1980) ("It is not necessary that a party seeking an injunction show an actual loss of sales before relief will be granted"). Indeed, the injuries flowing from a violation of a non-compete agreement as "a canonical form of irreparable harm," because those injuries "are difficult to prove and quantify." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 666-67 (7th Cir. 2015). Because of the difficult to quantify precise losses associated with a former employee's decision to funnel trade secrets to its competitor, the harm associated with that kind of unfair competition is presumed to be irreparable. *PrimeSource Building Products, Inc. v. Hutting Building Products, Inc.*, No. 16-cv-11390, 2017 WL 7795125 (N.D. Ill. Dec. 9, 2017). Indeed, the Agreement includes language whereby the parties recognize that breach of the restrictive covenants constitutes irreparable harm.

That TCC Wireless cannot point to a precise customer that it will lose as a result of Defendant's activities is of no material consequence. "[I]t is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'" *Hess Newmark Owens Wolf, Inc. v. Owens*, (7th Cir. ) "Competition changes probabilities," a fact that makes it difficult for businesses to easily "identify which contracts slipped from its grasp." *Id.* As such, "irreparable harm is presumed in cases where a former insider lures customers away through a competing business." *Cumulus Radio Corp. v. Olson*, 80 F. Supp. 3d 390 (C.D Il. 2015).

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

### IV. The Balance of Harms Supports a TRO and Preliminary Injunction.

Last, courts are often tasked with "balancing harms" to the parties, specifically whether a plaintiff will suffer greater harm without an injunction than a defendant will suffer if it is issued. *Buzz Barton & Assoc., Inc. v. Giannone,* 108 Ill. 2d 373, 387 (1985). However, "[i]t is well established in Illinois that the [balancing harms] doctrine is *inapplicable* where a defendant's actions are done with full knowledge of the plaintiff's rights and with an understanding of the consequences which might ensure." *Preferred Meal Sys., Inc. v. Guse*, 199 Ill. App. 3d 710, 727 (1st Dist. 1990) (emphasis added). Here, Defendant was well aware of the terms of the Agreement he negotiated. He was aware of its restrictive covenants, and that his breach would entitle TCC Wireless to injunctive relief. Yet, he thumbed his nose at his contractual obligations.

Nevertheless, balancing of harms supports the issuance of injunctive relief. TCC Wireless has demonstrated a high likelihood of success on its breach of contract claim. While an injunction may deprive Defendant of his current job, it will require Defendant to abide by the terms of the Agreement he voluntarily executed and for which he was compensated significantly. It leaves Defendant with other employment opportunities in the telecommunications industry that does not involve retail sales of cellular phones and services, and other sales opportunities similar to those he had before working for TCC Wireless. It also leaves Defendant with other employment opportunities in different markets, including the West Coast, Southwest, and Great Plains. Absent an injunction, TCC Wireless loses the benefits of an enforceable contract. It suffers from the uncertainty of lost business, as well as loss of employees, that it could have otherwise retained had Defendant abided by the terms of his agreement. Further, there is no harm to Defendant if the nonsolicitation covenants are enforced. Otherwise, TCC Wireless risks losing other employees for which it has expended significant time and resources to hire, train, work, promote and develop for higher level management.

For restrictive covenants in employment contracts to have anything but a hollow meaning, they must be enforced. Defendant, an intelligent and educated man, had been employed to TCC Wireless in a high-level, well compensated position for three years, a position that gave him access to confidential information. He signed the Agreement recognizing the confidentiality of the information and agreed to the restrictive covenants. He should abide by what TCC Wireless contracted and paid for.

## Conclusion

For these reasons, TCC Wireless asks this Court to enter a TRO and Preliminary Injunction preventing Defendant from continued employment with Express Stores, from violating the terms of his non-compete, non-solicitation and confidentiality agreements with TCC Wireless, and for any further relief that the Court deems just, equitable and proper.

Date: August 29, 2019

Respectfully submitted,

**TCC WIRELESS, LLC**

By: /s/ Louis J. Phillips

Louis J. Phillips
Patzik, Frank & Samotny Ltd. (Firm ID: 35160)
200 South Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 551-8300
lphillips@pfs-law.com

Patrice S. Arend (IL. 6228772)
27777 Franklin Road, Suite 2500
Southfield, MI 48034
248.351.3000
parend@jaffelaw.com
*Attorneys for TCC Wireless, LLC*

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

# EXHIBIT 1

Return Date: No return date scheduled
Hearing Date: 12/27/2019 10:00 AM - 10:00 AM
Courtroom Number: 2410
Location: District 1 Court
Cook County, IL

**12-Person Jury**

FILED
8/29/2019 11:30 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019CH10028

6380209

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
# COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| **TCC WIRELESS, LLC**, a Delaware limited Liability company, | ) | |
| Plaintiff, | ) | Case No.: 2019CH10028 |
| v. | ) | Jury Demand |
| **Kenneth Siller**, an individual, | ) | |
| Defendant. | ) | |

## VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

TCC Wireless, LLC ("TCC Wireless"), through its undersigned counsel, complains against Defendant Kenneth Siller as follows:

### *The Parties*

1. TCC Wireless is a Delaware limited liability company, with its principal place of business in Illinois. Therefore, TCC Wireless is a citizen of Illinois.

2. Defendant is an individual who resides in the State of New York. Defendant continuously and systematically entered the State of Illinois to transact business, among other things, by traveling to Illinois on numerous occasions in connection with the contracts and business relationships more fully described below.

3. Defendant consented to exclusive jurisdiction and venue in Illinois.

4. This Court has jurisdiction over Defendant pursuant to 735 ILCS 5/2-209 because, among other things, Defendant operates business in Cook County, Illinois and the parties entered into a contract or promise substantially connected to Illinois. Additionally, Defendant consented to exclusive jurisdiction and venue in Illinois and during his employment with TCC Wireless conducted business in Cook County.

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

5. Venue is proper in this Court pursuant to 735 ILCS 5/2-101 because Defendant is a nonresident of the State of Illinois.

***General Allegations***

6. TCC Wireless is an authorized independent dealer for T-Mobile, USA, Inc. TCC Wireless has retail stores that sell both cellular phones and related accessories and cellular phone plans, among other things, for T-Mobile.

7. The geographic scope of TCC Wireless' business is expansive. TCC Wireless has offices and retail stores in Illinois, as well as thirteen other states throughout the country. TCC Wireless' market encompasses retail stores in the following states: Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Massachusetts, New York, New Jersey, Ohio, Pennsylvania, Rhode Island, South Carolina and Wisconsin.

8. The wireless and cellular phone industry is very competitive. Several companies compete with TCC Wireless in the very same market for the same customers and the same sales channels. Moreover, TCC Wireless' success depends heavily on its ability to identify, negotiate, and lease retail space that is favorable for the operation of its business, and to identify appropriate markets for penetration. For these reasons, executives within the cellular phone retail industry are particularly competitive, as retail operators are constantly seeking information regarding expansion and market opportunities.

9. TCC Wireless spends substantial resources of time and hundreds of thousands of dollars to develop, cultivate and retain favorable relationships with its customers, to identify valuable market space, and to identify potential opportunities for business growth.

10. On or about December 1, 2016, TCC Wireless hired Defendant as its Senior Vice President of Sales and Marketing. In that position, Defendant was in charge of all of TCC

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

Wireless' sales and marketing strategies and strategic goals in growing its business, including overseeing 1,500 employees.

11. In connection with Defendant's employment with TCC Wireless, Defendant signed and agreed to the terms of an Employment Agreement. The Employment Agreement is attached as Exhibit A. Defendant negotiated the terms of the Employment Agreement with TCC Wireless.

12. Pursuant to the terms of the Employment Agreement, Defendant acknowledged that he fully understood the contents of the Employment Agreement and was encouraged to seek independent legal counsel before he voluntarily executed the Employment Agreement. (Employment Agreement ¶ 15(g), Ex. A.)

13. The Employment Agreement contains, among other things, a non-compete provision, which provides, in relevant part:

> [D]uring the period commencing on the Effective Date [December 1, 2016] and ending upon the expiration of one (1) year from the date that Executive ceases to be employed by the Company or any of its Affiliates for any reason (the "Covenant Period"), engage, or compete with any Protected Party, in the Business, or any facet of the Business anywhere within the United States of America, as an employee, independent contractor or otherwise;

(Employment Agreement ¶ 7(a)(i), Ex. A.) The "Business" is further defined as "operating wireless phone stores and the sale of wireless phones, accessories and related products and services, as the Company determines from time to time (all such activities and services provided by the Company and any and all other businesses and operations in which the Company may hereafter engage)." (*Id.*, Recitals(A), Ex. A.)

14. The non-compete provision of the Employment Agreement is reasonable as to the duration, geographic area and line of business that TCC Wireless now seeks to protect. The non-compete provision is designed to protect TCC Wireless' reasonably competitive business

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

information, including confidential information relating to its finances and business performance, employee compensation structure, employee commission structure, information regarding TCC Wireless' proprietary operational technology platform, sales strategies, business plans, operations, market strategies, and strategies for growth and sales, including plans for target acquisitions.

15. The Employment Agreement also contains a non-solicitation provision, which provides, in relevant part, as follows:

> iii. during the Covenant Period divert from any Protected Party, or by aid of others, do anything which would cause diversion from any Protected Party, of any business with any Customer or supplier with which such Protected Party has any contact or association in connection with the business; or
>
> iv. during the Covenant Period, solicit, induce or attempt to induce, either directly or indirectly, any employee or independent contractor of any Protected Party, (A) to change his, her or its contractual relationship with any Protected Party, (B) to leave the employment of or terminate his, her or its contractual relationship with any Protected Party, or (C) enter into the employ of or a contractual relationship in which Executive [Siller] has any interest whatsoever, or any competitor of any of the Protected Parties.

(Employment Agreement ¶ 7(a), Ex. A.)

16. The Employment Agreement contains, among other things, a confidentiality provision that defines Confidential Information as follows:

> In order to facilitate the provision of Executive's [Siller's] services to the Company [TCC Wireless] under this Agreement, the Company has disclosed and will disclose information it considers proprietary and confidential. This information may include, without limitation: (a) business financial, marketing and operational plans; (b) forecasts and projections; (c) sales plans and data; (d) information which relates to the Company's proprietary products, prototypes or plans; (e) customer lists and information; (f) the Company's listing information; and (g) other information whether or not identified as confidential of a confidential and non-public nature (collectively "Confidential Information"); provided, however, that Confidential Information shall not include any information: (x) prior to the Effective Date, was generally publicly available; (y) becomes publicly available without fault of or action on the part of Executive; or (z) is acquired by Executive following the cessation of employment with, or as a



PFS:007509.0006.2166918.2

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

> member of, the Company from a third party (other than a Protected Party), free from any restrictions as to its disclosure.

(Employment Agreement ¶ 9, Ex. A.)

17. The Employment Agreement's confidentiality provision requires Defendant to safeguard TCC Wireless' Confidential Information. The Employment Agreement provides, in that regard, as follows:

> (a) Executive agrees to hold Confidential Information in the strictest confidence. Executive will not disclose the Confidential Information to a third party;
>
> (b) Executive will not, at any time, use Confidential Information in any fashion, form, or manner, except to facilitate the provision of services by Executive on behalf of the Company;
>
> (c) Confidential Information may not be copied or reproduced without the Company's prior written consent;
>
> (d) Confidential Information shall at all times remain the sole property of the Company. Executive shall have no license, ownership rights, or any other rights or interests in the Confidential Information. Confidential Information disclosed by the Company, including any copies thereof, shall be returned to the Company by Executive upon request by the Company; provided, however, that upon termination of this Agreement, Executive shall return any Confidential Information within ten (10) days of such termination, without any request by the Company necessary or required.

(Employment Agreement ¶ 9, Ex. A.)

18. By signing the Employment Agreement, Defendant agreed that the restrictions set forth in the restrictive covenant provisions of the Employment Agreement, among others, are "reasonable and valid in geographical and temporal scope and in all other respect." (Employment Agreement ¶ 7(c), Ex. A.)

19. As the Senior Vice President of Sales and Marketing, Defendant was in a position where TCC Wireless shared with him and he otherwise acquired confidential and proprietary information regarding, among other things, the following:

(a) its finances and business performance. Defendant received, among other

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

things, regular financial reports on sales, earnings, business margins, employee compensation structures, employee commission structures, as well as details on TCC Wireless' proprietary operational technology platform;

(b) its business plans including, but not limited to, information regarding TCC Wireless' growth and sales strategy, including but not limited to TCC Wireless' plans to target acquisitions in the next several years; and

(c) TCC Wireless's sales strategies, the performance of many of its retail stores through the country, including performances of individual employees.

20. TCC Wireless relied on Defendant's agreement to be bound by the terms of the Employment Agreement is sharing its Confidential Information with him.

21. As the Senior Vice President of Sales and Marketing, Defendant worked with TCC Wireless' customers and sales channels with whom TCC Wireless maintains relationships nationwide.

22. During the course of Defendant's employment with TCC Wireless, he became familiar with, among other things, the manner in which TCC Wireless operates, and its sensitive information regarding its business such as its compensation structures, employee commission structure and payouts, proprietary operational technological platform, employment strategies, strategic growth plans, sales volumes, business profitability, weaknesses, as well as sales goals and targets, which apply to its stores nationwide.

23. Defendant was hired because of his background in the cellular phone industry. Recognizing that he would bring unique talent to TCC Wireless in a way to expand its business, TCC Wireless provided Defendant with a $120,000 signing bonus and one of the highest salaries in the business, averaging from $400,000-$450,000 per year. In turn, Defendant agreed to an

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

Employment Agreement that contained restrictive covenants, which were negotiated between the parties. Based on these covenants, TCC Wireless introduced Defendant to its proprietary and unique internal operations, software and back office operations.

24. Effective on or about August 5, 2019, Defendant voluntarily resigned from his position as Senior Vice President of Sales and Marketing for TCC Wireless.

25. On or about August 22, 2019, Defendant became employed with Express Stores, which is a direct competitor of TCC Wireless. (*See* Announcement, Ex. B.) Like TCC Wireless, Express Stores is an authorized independent dealer for T-Mobile, USA, Inc. and is in the business of selling sell both cellular phones and related accessories and cellular phone plans, among other things, for T-Mobile in many of the exact markets in which TCC Wireless operates its business and retail stores. Defendant did not choose another wireless carrier (e.g., non-T-Mobile) or even a T-Mobile dealer outside the markets in which TCC Wireless operates.

26. Defendant is now representing Express Stores in competition with TCC Wireless, immediately after and within a one-year period of terminating his employment with TCC Wireless.

27. On or about August 22, 2019, in violation of the non-solicitation provision in the Employment Agreement, Defendant, directly or indirectly, solicited Michael Erra, an employee of TCC Wireless to terminate his employment with TCC Wireless and to commence employment with Express Stores.

28. TCC Wireless entered into the Employment Agreement containing the above provisions to protect its interest in its Confidential Information and to protect its interest in its customers. TCC Wireless also entered the Employment Agreement to protect its employment workforce from the possible poaching of employees with confidential information, to protect the

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

costs associated with recruiting and hiring employee, to ensure a stable workforce necessary to ensure the stable growth of its business, and to prevent an *en masse* of resignations. Based on these covenants, TCC Wireless *introduced* Defendant to the rest of its management team, regional managers, district managers, and sales representatives. TCC Wireless has a protectable interest in enforcing the terms of the non-compete, non-solicitation and confidential provisions of the Employment Agreement.

29. The Confidential Information and knowledge Defendant currently retains are part of his thoughts and mental impressions, and, upon information and belief, his continued work with Express Stores creates the likelihood of the inevitable disclosure of the Confidential Information that are necessary and permanently maintained as part of his thoughts and mental impressions. Defendant cannot help but use his knowledge of TCC Wireless' compensation and commission structures, employment strategies, the proprietary operational technology platform, his knowledge of planned acquisition and market strategies, and his knowledge of existing products. Even if Defendant were to agree not to disclose any of this information, such an agreement would be completely ineffective because the Confidential Information acquired by Defendant during his employment by TCC Wireless is exactly the type of information that any sales manager needs and must use to effective compete in the retail cellular phone industry.

30. Express Store's employment of Defendant further threatens to, and will inevitably result in the disclosure of TCC Wireless' Confidential Information. As a former Vice President of Sales and Marketing, virtually all of TCC Wireless' Confidential Information will assist Defendant in targeting markets, targeting employees and will enable Defendant to directly compete with TCC Wireless.

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

31. Defendant agreed that in the event that he violated the restrictive covenants, among other things, TCC Wireless would be entitled to injunctive relief (Employment Agreement ¶¶ 7(c), 10, Ex. A.) The Employment Agreement provides:

> Specific Performance. In the event of a breach or attempted breach of any of the covenants set forth in Section 7, Section 8 or Section 9, in addition to any and all legal and equitable remedies immediately available, such covenants may be enforced by a temporary and/or permanent injunction. The parties agree that the remedy at law for a breach or threatened breach of any of the covenants set forth in Section 7, Section 8 or Section 9 would be inadequate.

(Employment Agreement ¶ 10, Ex. A.)

32. Defendant has previously revealed Confidential and proprietary information during the course of his employment in July 2018, when he met with senior management of T-Mobile and a prospective new partner in the T-Mobile dealer channel and disclosed confidential operational and financial information of TCC Wireless without its consent. TCC Wireless is rightfully concerned that Defendant will continue to disclose its Confidential Information now that he is no longer employed with the Company.

**COUNT I**
**Breach of Contract**

33. TCC Wireless incorporates the allegations contained in paragraphs 1 through 32 above as if full restated herein.

34. The Employment Agreement is a valid and enforceable agreement.

35. By signing the Employment Agreement and accepting the consideration offered, Defendant agreed to be bound by, among other things, reasonable non-compete and non-solicitation covenants and to never disclose any Confidential Information.

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

36. By working for Express Stores after and within a one-year period after terminating his employment with TCC Wireless, Defendant has breached the non-compete provision of the Employment Agreement.

37. By soliciting an employee of TCC Wireless to leave his employment with TCC Wireless to work for Express Stores, Defendant has breached the non-solicitation provision of the Employment Agreement.

38. As an employee of Express Stores, Defendant already has breached the terms of the reasonable non-compete and non-solicitation provisions in the Employment Agreement, and it is inevitable that he will continue to breach the Employment Agreement in a number of ways, including, but not limited to, his continued employment and work with Express Stores, providing confidential information to Express Stores, and soliciting or otherwise influencing and inducing (whether directly or indirectly) TCC Wireless employees to leave their employment with TCC Wireless to work for Express Stores, and soliciting or otherwise influencing and inducing (whether directly or indirectly) TCC Wireless's customers to do business with Express Stores instead of with TCC Wireless.

**Injunctive Relief**

39. TCC Wireless incorporates paragraphs 1 through 38 above as if fully restated herein in support of its request for injunctive relief.

40. TCC Wireless took reasonable efforts to maintain its secrecy of its Confidential Information, which provide actual and expected economic value to TCC Wireless.

41. Defendant's work for and/or employment with Express Stores has, upon information and belief, caused and will continue to cause, TCC Wireless irreparable injury and financial damage by knowingly, unlawfully taking and utilizing TCC Wireless's Confidential

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

Information and trade secrets and knowingly exploiting that information to his own advantage and the advantage of Express Stores. TCC Wireless has been damaged and will continue to be damaged in the form of lost competitive position and advantage, potential loss of employees, potential lost customers, revenue, and good will and other immeasurable, unquantifiable and irreparable injuries.

42. Defendant will, upon information and belief, either knowingly or through inevitable disclosure of his knowledge of TCC Wireless's trade secrets and Confidential Information continue to unlawfully exploit TCC Wireless's Confidential Information and trade secret information unless enjoined by this Court.

43. The damage to TCC Wireless resulting from Defendant's misappropriation of Confidential Information and trade secrets will be difficult to quantify and, in all likelihood, will be impossible to qualify with precision.

44. TCC Wireless is entitled to an order commanding Defendant, and any other person acting together or in concert with him who possesses any document, record of information of TCC Wireless, or any information derived therefrom, to return any and all documents, records and data to TCC Wireless.

45. TCC Wireless is further entitled to any injunction preventing the continued actual or threatened misappropriation, use and disclosure of Confidential Information and trade secrets obtained through or derived from Defendant's theft.

46. The value of the Confidential Information to be protected, although difficult to quantify monetarily, exceeds the value of $75,000. TCC Wireless spent hundreds of thousands of dollars developing its products, strategies and customers. Moreover, the loss of only a few of

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

its customers would exceed the value of $75,000. The value of the business managed by Defendant exceeded $1 million.

47. Monetary damages alone are insufficient to prevent continuing and ongoing damage and harm to TCC Wireless if Defendant continues his work and/or employment for Express Stores in violation of the Employment Agreement as set forth herein and TCC Wireless has no adequate remedy at law for Defendant's breaches of contract, misappropriation of Confidential Information and trade secrets because TCC Wireless invested a significant amount of time, money and energy to establish and foster its relationship with its customers and employees. The destruction of one's business relationship has long-term consequences because these relationships evolve over many years of development resulting in increased business and revenue over the life of the relationship. Consequently, the damage suffered by TCC Wireless is difficult to calculate because it cannot be clearly determined how much revenue any specific relationship would have created.

48. If Defendant is permitted to continue to work for a competitor in violation of his non-compete and to continue to solicit TCC Wireless employees and use TCC Wireless's Confidential Information and trade secrets, TCC Wireless will suffer additional irreparable harm.

49. TCC Wireless is justifiably concerned that any additional actions by Defendant will have tremendous impact on its goodwill, reputation and business.

50. TCC Wireless is entitled to injunctive relief specifically prohibiting Defendant from working for Express Stores and from using information he learned and had access to while employed at TCC Wireless.

51. Equities favor granting TCC Wireless an injunction. TCC Wireless has complied with all material terms of the Employment Agreement. Defendant, on the other hand, has

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

violated, is violating, and will continue to violate the non-compete provision of the Employment Agreement by working for Express Stores.

WHEREFORE, Plaintiff TCC Wireless, LLC requests that judgment be entered in its favor and against Defendant Kenneth Siller, as follows:

(A) An injunction temporarily, preliminarily, and permanently prohibiting Defendant during the period ending August 5, 2020 from working for any competitor of TCC Wireless, LLC, including Express Stores, in the following states: Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Massachusetts, New York, New Jersey, Ohio, Pennsylvania, Rhode Island, South Carolina, and Wisconsin, and any other state in which TCC Wireless may engage within the restrictive period;

(B) An injunction temporarily, preliminarily, and permanently prohibiting Defendant during the period ending August 5, 2020 from soliciting, inducing or attempting to induce, either directly or indirectly, an employee or independent contractor of TCC Wireless, LLC to change his, her or its contractual relationship with TCC Wireless or to enter into the employ of or a contractual relationship with Defendant, or an entity in which Defendant has an interest, or of any competitor of TCC Wireless, LLC;

(C) An injunction temporarily, preliminarily, and permanently prohibiting Defendant during the period ending August 5, 2020 from diverting from TCC Wireless, LLC, or by aiding others, doing anything which would cause diversion from TCC Wireless, of any business with any past or present customer or supplier of TCC Wireless, LLC with whom Defendant had any contact or learned of during his employment;

(D) An injunction temporarily, preliminarily, and permanently prohibiting Defendant from using or disclosing any of TCC Wireless, LLC's Confidential Information;

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

(E) Damages to be proven a trial in the amount in excess of $75,000 to which TCC Wireless, LLC may be entitled; and

(F) Awarding such other and further relief that TCC Wireless may be entitled, to the extent permitted by applicable law, including its costs.

Date: August 29, 2019

Respectfully submitted,

**TCC WIRELESS, LLC**

By: /s/ Louis J. Phillips
One of its attorneys

Louis L. Phillips
Patzik, Frank & Samotny Ltd. (Firm ID: 35160)
200 South Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 551-8300
lphillips@pfs-law.com

Patrice S. Arend (IL. 6228772)
27777 Franklin Road, Suite 2500
Southfield, MI 48034
248.351.3000
parend@jaffelaw.com
*Attorneys for TCC Wireless, LLC*

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

**VERIFICATION**

I, Eric S. Tarasievich on behalf of TCC Wireless, LLC, do swear and affirm as follows:

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in the Verified Complaint are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Dated: August 29, 2019

______________________, on behalf of TCC Wireless, LLC

PFS:007509.0006.2166793.1

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

# EXHIBIT A

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") is made and entered into as of December 1, 2016 (the "Effective Date") by and between TCC WIRELESS, LLC, a Delaware limited liability company (the "Company"), and KENNETH SILLER ("Executive").

## RECITALS:

A. The Company is engaged in the business of operating wireless phone retail stores and the sale of wireless phones, accessories and related products and services, as the Company determines from time to time (all such activities and services provided by the Company and any and all other businesses and operations in which the Company may hereafter engage are collectively hereinafter referred to as the "Business") to various individual and company customers of the Company (collectively, the "Customers").

B. The Company wishes to employ Executive as the Company's Senior Vice President-Sales and Marketing and desires to enter into an agreement with him setting forth the terms of such a relationship.

C. Executive has the knowledge, experience and expertise to serve in such capacity and desires to accept such employment with the Company on the terms and subject to the conditions set forth below.

## AGREEMENTS:

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

1. Employment. Subject to the terms, covenants and conditions set forth in this Agreement, the Company hereby agrees to employ Executive as the Company's Senior Vice President-Sales and Marketing. and Executive hereby accepts employment with the Company as its Senior Vice President-Sales and Marketing.

2. Term. Subject to the termination provisions set forth in Section 5 below, the term of Executive's employment with the Company under this Agreement shall commence on the Effective Date and shall continue until the first anniversary of the Effective Date (the "Initial Term"). At the conclusion of the Initial Term and any Renewal Term (as defined below) thereafter, and unless terminated earlier, this Agreement shall automatically extend for an additional one (1) year period, unless either party gives the other party written notice at least 60 days prior to the end of the then-current term of such party's intention not to renew this Agreement for the following annual period (each a "Renewal Term" and, collectively with the Initial Term, the "Term").

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

3. Capacity and Performance. Throughout the Term of this Agreement:

(a) Executive shall serve the Company as its Senior Vice President-Sales and Marketing on a full-time basis and shall perform such acts, duties and responsibilities consistent with his position on behalf of the Company, as are customarily done and performed by individuals holding such position in companies in similar businesses and of similar size to the Company, and such other duties as may be designated from time to time by the Company's Chief Executive Officer or Chief Financial Officer, to whom the Executive shall regularly report. The expenditure of reasonable amounts of time by Executive for personal, charitable or investment activities shall not be deemed a breach of this Agreement, provided that such activities do not interfere with the services required to be rendered by Executive under this Agreement and are not contrary to the interests of the Company.

(b) Executive shall devote his full business time and his reasonable best efforts, business judgment, skill and knowledge exclusively to the advancement of the business and interests of the Company and to the discharge of his duties and responsibilities hereunder.

4. Compensation and Benefits. As compensation for all services performed by Executive under this Agreement and during the Term:

(a) Base Salary. As compensation for the services to be performed under this Agreement, the Company shall pay to Executive, during the Term, an annual salary (the "Base Salary") at the rate of $245,000.00 per annum, less applicable deductions, payable in accordance with the Company's usual payroll practices.

(b) Monthly Performance Bonus. For each calendar month, commencing with December 2016, Executive shall be eligible to receive a monthly performance bonus (a "Performance Bonus") as follows:

i. Executive shall receive a Performance Bonus in the amount set forth on the attached Schedule A corresponding to the applicable Traffic Conversion Percentage for such month (for purposes hereof, "Traffic Conversion Percentage" means the traffic conversion percentage for the Company on a consolidated basis as reported by T-Mobile's Sharepoint System).

ii. In addition to any Performance Bonus earned under subsection i. above, Executive shall receive a $2,500 Performance Bonus for each month in which the Company achieves at least 125% of the Key Sales Objectives

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

No. 1 (KSO #1) established by T-Mobile for such month (as determined by T-Mobile through its DCS system and final commission report for such month) and Executive shall receive a $2,500 Performance Bonus for each month in which the Company achieves at least 125% of the Key Sales Objectives No. 2 (KSO #2) established by T-Mobile for such month (as determined by T-Mobile through its DCS system and final commission report for such month).

iii. Any earned Performance Bonus shall be paid in accordance with the Company's usual bonus/commission pay practices (typically within 60 days after the end of the calendar month for which the Performance Bonus was earned).

iv. Executive must be employed by the Company on the payment date to receive any Performance Bonus.

(c) One-Time Signing Bonus. The Company shall pay Executive a one-time signing bonus of $120,000.00, which shall be payable in equal quarterly increments of $30,000.00 (less applicable deductions) within fifteen (15) days after the beginning of each calendar quarter occurring in 2017.

(d) Paid Vacation Off. During the Term, Executive shall be entitled to four weeks of paid vacation off annually, to be taken at such times and intervals as shall be determined by Executive, subject to the reasonable business needs of the Company.

(e) Business Expenses. During the Term, the Company shall pay or reimburse Executive for reasonable, customary and necessary business expenses incurred or paid by him in the performance of his duties and responsibilities hereunder, subject to such reasonable substantiation and documentation as may be specified by the Company from time to time.

(f) Other Benefits. During the term hereof, Executive shall be entitled to participate in any and all employee benefit plans generally available from time to time to senior management level employees of the Company (and for which Executive qualifies under the terms of the plans). The Company may alter, modify, terminate, add to or discontinue the employee benefit plans that are from time to time in effect for its employees generally at any time as it, in its sole judgment, determines to be appropriate, without recourse by Executive.

5. Termination.

(a) Termination upon Death or Disability. Executive's employment under this Agreement shall terminate automatically upon Executive's death or if Executive becomes Disabled. For purposes of this Agreement, Executive shall be deemed to be "Disabled" if Executive becomes unable to perform the essential functions and responsibilities of his

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

position with reasonable accommodation, as required under the Americans with Disabilities Act, as the same has and may be amended (the "ADA"), by virtue of physical or mental disability, as defined under the ADA.

(b) Termination by the Company for Cause. During the Term, the Company may immediately terminate this Agreement for "Cause." For purposes of this Agreement, "Cause" shall mean, in each case as determined by the Company:

i. Executive's material breach of any of the terms, provisions or covenants contained in this Agreement which, after written notice from the Company of such breach, has not been cured within thirty (30) days after he receives such notice;

ii. Executive's conviction of or plea of guilty or *nolo contendere* to a felony, misdemeanor or other crime that either (A) involves moral turpitude, dishonesty, fraud, theft, embezzlement, or financial impropriety or (B) provides for a term of imprisonment;

iii. Executive's commission of any act or omission constituting misappropriation, unethical business conduct, disloyalty or breach of fiduciary duty which is injurious to the Company, the specific nature of which shall be set forth in a written notice by the Company to Executive;

iv. Executive's failure to adequately perform his duties, or failure to follow the reasonable instruction of the Company, which after written notice from the Company of such failure, has not been cured within thirty (30) days after he receives such notice;

v. Executive's misappropriation of funds or assets of the Company; or

vi. Executive fails to earn any Performance Bonus during a period of at least three (3) months in any consecutive twelve (12) month period.

(c) Termination by Executive for Good Reason. Executive may terminate his employment for Good Reason provided that (i) Executive has provided the Company with thirty (30) days' prior written notice setting forth in reasonable detail the basis for such Good Reason and (ii) the Company has not cured the Good Reason within such thirty (30) day period, in which case the Termination Date shall be the 30th day after Executive gave such notice The following shall constitute "Good Reason" for termination by Executive:

i. A material reduction of the Base Salary; or

ii. The material removal or diminution of the authority, responsibilities

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

or duties of Executive (other than any such authorities, duties or responsibilities assigned at any time which are by their nature, or which are identified at the time of assignment, as being temporary or short term).

No condition enumerated in the preceding sub-sections (i) and (ii) will be deemed to be Good Reason unless within 30 days of the initial existence of such condition, the Executive will have given the Company written notice thereof specifically describing the condition giving rise to Good Reason and allowing the Company a period of 30 days from the date of receipt of the notice to remedy such condition; and provided further, however, in no event will a condition give rise to Good Reason hereunder unless, within 60 days after the initial existence of such condition, the Executive will have actually terminated his employment with the Company by giving written notice of resignation for failure of the Company to remedy such condition.

(d) Termination under other Circumstances. During the Term, either the Company or the Executive may voluntarily terminate this Agreement upon thirty (30) days' advance written notice to the other party for any reason or no reason whatsoever; it being understood that Executive's employment is at-will.

6. Effect of Termination of Employment.

(a) Upon the termination of this Agreement for any reason, the Executive shall be entitled to, and the Company shall pay Executive, an amount equal to: (i) any earned but unpaid Base Salary covering the period of employment prior to the effective date of termination; and (ii) unreimbursed business expenses pursuant to Section 4 above. Except as otherwise specified in this Section 6(a) or Section 6(b) below, Executive shall not be entitled to any other compensation or benefits upon the termination of his employment with the Company for any reason whatsoever.

(b) If Executive is terminated by the Company without Cause or if Executive terminates his employment for Good Reason, then, subject to Executive signing and delivering to the Company (and not revoking) a general release in favor of the Company, in substantially the form attached hereto as Exhibit A, within 30 days following presentation thereof, and provided that Executive complies with the covenants set forth in Sections 7, 8, 9 and 12 below, in addition to the payments and benefits described in Section 6(a), the Company shall continue to pay Executive, in accordance with the Company's regular payroll practice, Executive's Base Salary for twelve (12) months, less applicable deductions (the "Severance Compensation"); provided, however, that: (i) the first payment of the Severance Compensation pursuant to this Section 6(b) shall be paid on the 60th day following Executive's termination of employment and shall include any amounts due prior thereto, and (ii) if Executive is terminated by the Company without Cause or if Executive terminates his employment for Good Reason prior to December 1, 2017, then the Severance Compensation shall only be paid for the balance of the Initial Term. For the avoidance of doubt, the Executive shall not be entitled to the payments

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

under this Section 6(b), if the Executive's employment is terminated as a result of the Executive's death, if the Executive becomes Disabled, if the Company terminates the Executive's employment for Cause, or if the Executive voluntarily terminates his employment with the Company without Good Reason.

7. Restrictive Covenants.

(a) *Terms.* The Company and Executive acknowledge and agree that for Executive to compete with the Company during the time the Executive is employed by the Company, and for a limited time thereafter, would be contrary to the purposes for which the parties entered into this Agreement. In order to induce the Company to enter into this Agreement, Executive covenants, warrants and agrees, for the benefit of the Company, its parents, subsidiaries, successors and assigns (collectively, the "Protected Parties"), that without first obtaining the express written consent of the Company, which may be granted or withheld in the Company's sole and absolute discretion, Executive shall not, either directly or indirectly:

i. during the period commencing on the Effective Date and ending upon the expiration of one (1) year from the date that Executive ceases to be employed by the Company or any of its Affiliates for any reason (the "Covenant Period"), engage, or compete with any Protected Party, in the Business, or any facet of the Business anywhere within the United States of America, as an employee, independent contractor or otherwise;

ii. during the Covenant Period, have any ownership interest in (whether as a shareholder, partner, member, associate, owner or otherwise), make any loan to or investment in, any corporation, partnership, limited liability company, association, trust, firm or other enterprise which is engaged in, or competes with, any Protected Party in the Business, or any facet of the Business, anywhere within the United States of America; provided, however, that notwithstanding the foregoing, Executive may invest in any publicly-held corporation engaged in the Business, if his aggregate investment does not exceed one (1%) percent in value of the issued and outstanding capital stock of such corporation;

iii. during the Covenant Period, divert from any Protected Party, or by aid of others, do anything which would cause diversion from any Protected Party, of any business with any Customer or supplier with which such Protected Party has any contact or association in connection with the Business; or

iv. during the Covenant Period, solicit, induce or attempt to induce, either directly or indirectly, any employee or independent contractor of any Protected Party, (A) to change his, her or its contractual relationship with any Protected Party, (B) to leave the employment of or terminate his, her or its contractual relationship with any Protected Party, or (C) enter into the employ of or a

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

contractual relationship with Executive, any entity in which Executive has any interest whatsoever, or any competitor of any of the Protected Parties.

(b) *Executive Representations*. Executive hereby represents and warrants to the Company that Executive is not in breach of any existing covenant not to compete. nonsolicitation agreement, confidentiality agreement or other substantially similar agreement, nor will Executive be in breach of any such agreement as a result of his employment with, or performance of services for, the Company.

(c) *Enforcement.* The covenants set forth in this Section 7 shall be a series of separate covenants, one for each and every state, county and other municipal division within the United States of America. The covenants set forth in this Section 7 are reasonable and valid in geographical and temporal scope and in all other respects. If any court determines that any covenant set forth in this Section 7, or any portion of any such covenant, is invalid or unenforceable, the remainder of the covenants set forth in this Section 7 shall not be affected and shall be given full force and effect, without regard to the invalid covenant or the invalid portion. If any court determines that any covenant set forth in this Section 7, or any portion of any such covenant, is unenforceable because of its duration or geographic scope, such court shall have the power to reduce such duration or scope, as the case may be, and to enforce such covenant or portion in such reduced form. The Company and Executive confer jurisdiction to enforce the covenants set forth in this Section 7 on the courts of any jurisdiction within the geographical scope of such covenants. If the courts of any one or more of such jurisdictions hold the covenants set forth in this Section 7, or any portion of any such covenant, unenforceable by reason of the breadth of such scope or otherwise, such determination shall not bar or in any way affect the right of any of the Protected Parties to the relief provided in the courts of any other jurisdiction within the geographical scope of such covenants as to breaches of such covenants in such other respective jurisdictions.

8. Intellectual Property Rights.

(a) *Assignment of Inventions*. Executive recognizes that he may, individually or jointly with others, discover, conceive, make, perfect or develop inventions, discoveries, new contributions, concepts, ideas, developments, processes, formulas, methods, compositions, techniques, articles, machines and improvements, and all original works of authorship and all related know-how, whether or not patentable, copyrightable or protectable as trade secrets for and on behalf of the Company pursuant to this Agreement ("Inventions"). Executive agrees that all such Inventions are the sole and exclusive property of the Company, all to the extent any such Inventions are capable of ownership under applicable law. EXECUTIVE AGREES THAT ANY PARTICIPATION BY HIM IN A COPYRIGHTABLE WORK IS A WORK MADE FOR HIRE, AS DEFINED IN TITLE 17, UNITED STATES CODE, TO THE EXTENT PERMITTED BY LAW FOR THE SOLE AND EXCLUSIVE BENEFIT OF THE COMPANY AND EXECUTIVE HEREBY ASSIGNS TO THE COMPANY ALL OF HIS RIGHTS IN AND TO SUCH INVENTIONS. Executive shall maintain adequate and current written

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

records of all Inventions, which shall remain the property of the Company, as applicable and be available to the Company at all times. At the Company's request Executive shall promptly sign and deliver all documents necessary to vest in the Company, all right, title and interest in and to any Inventions. If the Company is unable, after reasonable effort, to secure Executive's signature on any document needed to vest in the Company all right, title and interest in and to any Inventions, whether because of Executive's physical or mental incapacity or for any other reason whatsoever, Executive hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Executive's agent and attorney-in-fact, to act for and in Executive's behalf and stead to execute and file any such document and to do all other lawfully permitted acts to further the prosecution and enforcement of patents, copyrights or similar protections with the same legal force and effect as if executed by Executive.

(b) *Third Party Intellectual Property.* Executive hereby represents and warrants that he is not a party or subject to any agreements or other arrangements protecting the trade secrets or other intellectual property of any third-party.

9. Confidentiality. In order to facilitate the provision of Executive's services to the Company under this Agreement, the Company has disclosed and will disclose information it considers proprietary and confidential. This information may include, without limitation: (a) business, financial, marketing and operational plans; (b) forecasts and projections; (c) sales plans and data; (d) information which relates to the Company's proprietary products, prototypes, or plans; (e) customer lists and information; (f) the Company's listing information; and (g) other information whether or not identified as confidential of a confidential and non-public nature (collectively, "Confidential Information"); provided, however, that Confidential information shall not include any information: (x) prior to the Effective Date, was generally publicly available; (y) becomes publicly available without fault of or action on the part of Executive; or (z) is acquired by Executive following the cessation of his employment with, or as a member of, the Company from a third party (other than a Protected Party), free of any restrictions as to its disclosure. In connection therewith, the parties agree that:

(a) Executive agrees to hold the Confidential Information in the strictest confidence. Executive will not disclose the Confidential Information to any third party.

(b) Executive will not, at any time, use the Confidential Information in any fashion. form, or manner, except to facilitate the provision of services by Executive on behalf of the Company.

(c) Confidential Information may not be copied or reproduced without the Company's prior written consent.

(d) Confidential Information shall at all times remain the sole property of the Company. Executive shall have no license, ownership rights, or any other rights or interests in the Confidential Information. Confidential Information disclosed by the Company, including copies thereof, shall be returned to the Company by Executive upon

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

request by the Company; provided, however, that upon termination of this Agreement, Executive shall return any Confidential Information within ten (10) days of such termination, without any request by the Company being necessary or required.

10. Specific Performance. In the event of a breach or attempted breach of any of the covenants set forth in Section 7, Section 8 or Section 9, in addition to any and all legal and equitable remedies immediately available, such covenants may be enforced by a temporary and/or permanent injunction. The parties agree that the remedy at law for a breach or threatened breach of any of the covenants set forth in Section 7, Section 8 or Section 9 would be inadequate.

11. Key Man Insurance. Executive agrees that the Company may obtain a "key man" life insurance policy on Executive's life, at the Company's sole expense and with the Company as the sole beneficiary thereof. Executive shall (i) cooperate fully with the Company in obtaining such life insurance, (ii) sign any necessary consents, applications and other related forms or documents, and (iii) take any required medical examinations.

12. Cooperation. Following termination of the Executive's employment for any reason, at the request of the Company, (i) the Executive shall, during the three month period following termination of employment, (A) cooperate with the Company in transitioning his duties and activities on behalf of the Company to one or more executives of the Company, and (B) provide information and other assistance relating to the business operations and activities of the Company to representatives of the Company, as requested by the Company; and (ii) the Executive shall cooperate with the Company in connection with any litigation or regulatory matters in which the Executive may have relevant knowledge or information. The Company shall reimburse the Executive for the reasonable expenses and costs incurred by him in connection with such cooperation and assistance.

13. Indemnification. Subject to limitations imposed by law, the Company shall indemnify and hold harmless Executive to the fullest extent permitted by law from and against any and all claims, damages, expenses (including reasonable attorneys' fees), judgments, penalties, fines, settlements, and all other liabilities actually and reasonably incurred or paid by him in connection with the investigation, defense, prosecution, settlement or appeal of any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and to which Executive was or is a party or is threatened to be made a party by reason of the fact that Executive is or was an officer, employee or agent of the Company, or by reason of anything done or not done by Executive in any such capacity or capacities, provided that Executive complied with his obligations under this Agreement, Executive acted in good faith, in a manner that was not grossly negligent or constituted willful misconduct and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The Company also shall pay any and all expenses (including reasonable attorney's fees) incurred by the Executive as a result of the Executive being called as a witness in connection with any matter involving the Company and/or any of its officers or managers.

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

14. Notices. All notices, requests, consents and other communications, required or permitted to be given under this Agreement shall be personally delivered in writing or shall have been deemed duly given when received after it is posted in the United States mail, postage prepaid, registered or certified, return receipt requested addressed as set forth below. In addition, a party may deliver a notice via another reasonable means that results in the recipient party receiving actual notice, as conclusively demonstrated by the party giving such notice.

If to the Company:

TCC Wireless, LLC
565 Randy Road
Carol Stream, Illinois 60188
Email: jay@tccmobile.com
Fax:
Attn: Mr. Javed Malik

If to Executive:

Kenneth Siller
10535 Keller Road
Clarence, New York 14031
Email: ksiller@hotmail.com
Fax: ______________

15. Miscellaneous.

(a) The failure of any party to enforce any provision or protections of this Agreement shall not in any way be construed as a waiver of any such provision or provisions as to any future violations thereof, nor prevent that party thereafter from enforcing each and every other provision of this Agreement. The rights granted the parties herein are cumulative and the waiver of any single remedy shall not constitute a waiver of such party's right to assert all other legal remedies available to it under the circumstances.

(b) This Agreement has been executed in, and shall be construed and enforced in accordance with the laws of the State of Illinois, without regard to the conflict of law rules of such state. The state and federal courts sitting in the state of Illinois shall have exclusive jurisdiction over any and all disputes arising out of or relating to this Agreement. Each party to this Agreement irrevocably and unconditionally (i) consents to the exclusive jurisdiction of such courts in respect of any action, suit or proceeding arising out of or relating to this Agreement, (ii) waives any defense of lack of personal jurisdiction in such courts in respect of any action, suit or proceeding arising out of or relating to this Agreement, and (iii) waives any objection to the laying of venue of any action, suit or proceeding arising out of or relating to this Agreement.

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

(c) The provisions of this Agreement are severable and if anyone or more provisions may be determined to be illegal or otherwise unenforceable, in whole or in part. the remaining provisions and any partially unenforceable provision to the extent enforceable in any jurisdiction nevertheless shall be binding and enforceable.

(d) This Agreement sets forth the entire understanding and agreement of Executive and the Company with respect to its subject matter and supersedes all prior understandings and agreements, whether written or oral, in respect thereof. No modification, termination or attempted waiver of this Agreement shall be valid unless in writing and signed by the party against whom the same is sought to be enforced.

(e) The rights and obligations of Company under this Agreement shall inure to the benefit of, and shall be binding on, Company and its successors and assigns. This Agreement is personal to Executive and he may not assign his obligations under this Agreement in any manner whatsoever and any purported assignment shall be void. For all purposes under this Agreement, the term "Company" shall include any successor to Company's business and/or assets that assume the Company's rights and obligations under this Agreement.

(f) The headings and captions used in this Agreement are for convenience of reference only and shall not be considered in interpreting this Agreement.

(g) Each party expressly represents and warrants to each other that: (i) before executing this Agreement, such party has fully informed itself of the terms, contents, conditions and effects of this Agreement; (ii) such party has relied solely and completely upon its own judgment in executing this Agreement; (iii) such party has been advised to and has had the opportunity to seek the advice of counsel before executing this Agreement; (iv) such party, whether or not it chose to seek the advice of counsel, has acted voluntarily and of its own free will in executing this Agreement; (v) such party, whether or not it chose to seek the advice of counsel, is not acting under duress, whether economic or physical, in executing this Agreement; and (vi) and such party, if it chose not to seek the advice of counsel, shall not raise any claims against the enforcement of this Agreement that arise from its decision not to do so.

(h) This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document, and copies (facsimile, photostatic, electronic or otherwise) of signatures to this Agreement shall be deemed to be originals and may be relied upon to the same extent as though such copy, fax or electronically transmitted signature was an original.

(i) Any payments provided for in this Agreement shall be paid net of any applicable income tax withholding required under federal, state or local law.

16. Survival. Sections 6, 7, 8, 9, 10, 12 and 13 will survive and continue in full force in accordance with their terms notwithstanding any termination of this Agreement.

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

17. Section 409A. It is intended that this Agreement will be exempt from, or comply, with Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") and any regulations and guidelines promulgated thereunder (collectively, "Section 409A"), and the Agreement shall be interpreted on a basis consistent with such intent. No action or failure to act pursuant to this Section 17 shall subject the Company to any claim, liability, or expense, and the Company shall not have any obligation to indemnify or otherwise protect Executive from the obligation to pay any taxes, interest or penalties pursuant to Section 409A. Notwithstanding any provision to the contrary in this Agreement, if Executive is deemed on the date of his "separation from service" (within the meaning of Treas. Reg. Section 1.409A-1(h)) with the Company to be a "specified employee" (within the meaning of Treas. Reg. Section 1.409A-1(i)), then with regard to any payment or benefit that is considered deferred compensation under Section 409A payable on account of a "separation from service" that is required to be delayed pursuant to Section 409A(a)(2)(B) of the Code (after taking into account any applicable exceptions to such requirement), such payment or benefit shall be made or provided on the date that is the earlier of (i) the expiration of the six (6)-month period measured from the date of Executive's "separation from service," or (ii) the date of Executive's death (the "Delay Period"). Upon the expiration of the Delay Period, all payments and benefits delayed pursuant to this Section 17 (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to Executive in a lump sum and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein. Notwithstanding any provision of this Agreement to the contrary, for purposes of any provision of this Agreement providing for the payment of any amounts or benefits upon or following a termination of employment that are considered deferred compensation under Section 409A, references to Executive's "termination of employment" (and corollary terms) with the Company shall be construed to refer to Executive's "separation from service" (within the meaning of Treas. Reg. Section 1.409A-1(h)) with the Company. Whenever payments under this Agreement are to be made in installments, each such installment shall be deemed to be a separate payment for purposes of Section 409A.

*[Signatures on following page]*

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

**IN WITNESS WHEREOF,** the parties have executed this Employment Agreement as of the day and year first above written.

**COMPANY:**

TCC WIRELESS, LLC, a Delaware limited liability company

By: ______________________

Print Name: JAVED MALIK.

Its: CEO.

**EXECUTIVE:**

______________________

KENNETH SILLER

[Signature Page to Employment Agreement]

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

**Exhibit A**
Form of Release

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Kenneth Siller ("Executive") hereby delivers this Release ("Release") to TCC Wireless, LLC, a Delaware limited liability company (the "Employer") in connection with the termination of Executive's employment with Employer and its subsidiaries. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in that certain Employment Agreement dated as of December 1, 2016, by and between Employer and Executive (the "Employment Agreement").

1. Executive Release of Rights. Except for the payments to be made following the Termination Date to Executive pursuant to Section 6 of the Employment Agreement, Executive (defined for the purpose of this Section 1 as Executive and Executive's agents, representatives, attorneys, assigns, heirs, executors, and administrators) fully and unconditionally releases Employer, its subsidiaries and each of its respective past or present employees, agents, insurers, attorneys, administrators, officers, directors, shareholders, members, managers, parents, predecessors, successors, employee benefit plans, and the sponsors, fiduciaries, or administrators of Employer's employee benefit plans (collectively, the "Released Parties") from, and agrees not to bring any action, proceeding, or suit against any of the Released Parties regarding, any and all liabilities, claims, demands, actions, causes of action, suits, grievances, debts, sums of money, agreements, promises, damages, back and front pay, costs, expenses, attorneys' fees, and remedies of any type, from the beginning of time to the date hereof, including, without limitation, any liability arising or that may have arisen out of or in connection with Executive's employment with, or termination of employment from, Employer, including, but not limited to, claims, actions or liabilities under (1) Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Civil Rights Act of 1866, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Fair Labor Standards Act, the Family and Medical Leave Act, the Worker Adjustment and Retraining Notification Act, the Older Workers Benefit Protection Act, and the Employee Retirement Income Security Act of 1974; (2) any other federal, state or local statute, ordinance, or regulation regarding employment, termination of employment, or discrimination in employment, and (3) the common law of any state relating to employment contracts, wrongful discharge, defamation, or any other matter, provided, however, that Executive is not releasing, and is not agreeing to forego bringing any action, suit or proceeding regarding (A) any claim that cannot be legally released, (B) any claim based upon any vested benefits Executive may have under any employee welfare benefit plan of Employer or its subsidiaries, or (C) any of his rights under this Release.

2. Waiver of Reinstatement. Executive waives any reinstatement or future employment with Employer or its subsidiaries and agrees never to apply for employment or otherwise seek to be hired, rehired, employed, re-employed, or reinstated by Employer or any of its subsidiaries.

3. Severability. The provisions of this Release shall be severable and the invalidity of any provision shall not affect the validity of the other provisions; provided, however, that upon a finding by a court of competent jurisdiction that any release in Section 1 above is illegal, void

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

or unenforceable, Executive agrees to execute promptly a release and covenant that is legal and enforceable.

4. Governing Law. This Release shall be governed by and construed in accordance with the laws of the State of Illinois without regard to conflicts of laws principles that would cause any state's laws, other than the laws of the State of Illinois, to apply.

5. Scope of Release. Executive understands that he remains bound to those provisions in his Employment Agreement that survive the termination of his employment in accordance with Section 7, 8 and 9 thereof. Except as specifically set forth in such provisions, this Release contains the entire agreement and understanding between Executive and Employer concerning the matters described herein, and supersedes all prior agreements, discussions, negotiations, understandings and proposals of the parties. The terms of this Release cannot be changed except in a subsequent document signed by both parties.

6. Revocation Period. Executive has the right to revoke this Release solely with regard to his release of claims under the Age Discrimination in Employment Act and the Older Workers Benefit Protection Act for up to seven (7) days after he signs it. In order to revoke this Release, Executive must sign and send a written notice of the decision to do so, addressed to Employer, and that written notice must be received by Employer no later than the eighth (8th) day after Executive signed this Release. If Executive revokes this Release, Executive will not be entitled to any consideration from Employer described in Section 6 of the Employment Agreement.

7. Knowing and Voluntary Waiver. Executive acknowledges that:

a. Executive has carefully read this Release and fully understands its meaning;

b. Executive had the opportunity to take up to 21 days after receiving this Release to decide whether to sign it;

c. Executive understands that Employer is hereby advising him, in writing, to consult with an attorney before signing it;

d. Executive is signing this Release, knowingly, voluntarily, and without any coercion or duress; and

e. Everything Executive is receiving for signing this Release is described in the Employment Agreement or this Release and no other promises or representations have been made to cause Executive to sign it.

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

IN WITNESS WHEREOF, Executive has executed this Release as of the date below.

EXECUTIVE:

Dated: 11/30/16

Kenneth Siller

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

## SCHEDULE A

Traffic Conversion Bonus

| Traffic Conversion Percentage | Performance Bonus |
|---|---|
| Less than 9% | 0 |
| At least 9% but less than 10% | $5,000.00 |
| At least 10% but less than 10.5% | $7,500.00 |
| At least 10.5% but less than 11% | $12,000.00 |
| At least 11% but less than 11.5% | $15,000.00 |
| At least 11.5% but less than 12% | $17,500.00 |
| At least 12% | $20,000.00 |

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

# EXHIBIT B

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

**From:** Andrea Sealey <asealey@expmgnt.com>
**Date:** Tuesday, August 20, 2019 at 8:57 AM
**To:** Andrea Sealey <asealey@expmgnt.com>
**Subject:** IMPORTANT Organizational Announcement

**[External]**



August 20, 2019

At Express, we are committed to the continued growth of our employees and the company as a whole. We are always looking for new ways to bring both our employees and our company to the Next Level while not losing sight of our Employee First initiatives. It is in the spirit of continued growth and positioning ourselves to be in the best spot for potential expansion that Express Stores is excited to announce the following organizational changes that will go into effect on Monday, August 26, 2019.



**Ryan Warner:** Ryan has been with Express since joining as the Vice President of Sales in 2012. In 2017, Ryan was promoted to Chief Operating Officer, leading the way through multiple growth and expansion opportunities while overseeing the day to day operations of the

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

company. He has championed many initiatives to continue to put Express in a position for further growth while balancing the direct oversight of the Sales department and strategic oversight for the entire organization. Beginning Monday, August 26, Ryan will assume a new role as the **Chief Executive Officer** for Express Stores. This new role will allow him to focus his energy and leadership on taking Express Stores to the next level. Ryan's passion for an Employee First culture will remain unwavering as he leads the company's strategic growth initiatives and continues to find new ways to make Express Stores an even greater place to work!



**Phil Speiser:** Phil joined Express in May of 2014 as the Vice President of Operations. In 2017, Phil was promoted to Senior Vice President of Operations. During his time with Express, Phil has overseen the growth of the operations team to include Operations Manager support for each market, multiple layers of leadership within the department, the evolution of the Loss Prevention team, and the addition of entirely new departments such as the Reporting and Analytics team. Phil has been an invaluable asset to the operational side of our business during his tenure with Express. On Monday, August 26, Phil will assume a new role as **Chief Operations Officer.** In this new capacity, Phil will continue to oversee the Operations of the business, focusing on new possibilities to develop relevant, more efficient processes and procedures for more streamlined operations to support and protect the company assets.



**Ken Siller:** Express Stores is pleased to welcome Ken to the Express family as **Chief Revenue Officer**. Ken brings with him over 12 years of experience in the Telecom industry, dating back to a start in 2007. He has lead sales teams in T-Mobile and other large partners driving tremendous results and is excited to bring that expertise to Express. Ken understands and values people and is looking to use his passion and experiences to continue to build on our Employee First culture. Ryan Warner previously worked with Ken and has said, "Ken is one of the best leaders I have ever had the pleasure of working with, and I am excited about the potential for Express under his leadership." Ken is a father of four and resides in Buffalo, NY. In his spare time, he is an avid snowmobiler. We look forward to all that Ken will bring to Express to take our sales teams to the next level as he begins his new position on Monday, August 26.

**Andrea Sealey**

FILED DATE: 8/29/2019 1:08 PM 2019CH10028
FILED DATE: 8/29/2019 11:30 AM 2019CH10028

**Director of Communications and Employee Development**
**Express Stores** | 158 Tices Lane, East Brunswick NJ 08816
p 757-232-7735 | e Andrea.Sealey@T-Mobile.com |

**Connect with Us:**

Express Stores

"We are a team of dynamic wireless leaders that cultivate success through integrity and the commitment to exceed customer expectations to deliver exceptional results"

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the system manager or sender. This message contains confidential information and is intended only for the individual named. If you are not the named individual you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this in error and delete this e-mail from your systems. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

# EXHIBIT 2


United States
EXPRESS IS EXPANDING
Join the movement
227
1702

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

# EXHIBIT 3

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") is made and entered into as of December 1, 2016 (the "Effective Date") by and between TCC WIRELESS, LLC, a Delaware limited liability company (the "Company"), and KENNETH SILLER ("Executive").

## RECITALS:

A. The Company is engaged in the business of operating wireless phone retail stores and the sale of wireless phones, accessories and related products and services, as the Company determines from time to time (all such activities and services provided by the Company and any and all other businesses and operations in which the Company may hereafter engage are collectively hereinafter referred to as the "Business") to various individual and company customers of the Company (collectively, the "Customers").

B. The Company wishes to employ Executive as the Company's Senior Vice President-Sales and Marketing and desires to enter into an agreement with him setting forth the terms of such a relationship.

C. Executive has the knowledge, experience and expertise to serve in such capacity and desires to accept such employment with the Company on the terms and subject to the conditions set forth below.

## AGREEMENTS:

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

1. Employment. Subject to the terms, covenants and conditions set forth in this Agreement, the Company hereby agrees to employ Executive as the Company's Senior Vice President-Sales and Marketing, and Executive hereby accepts employment with the Company as its Senior Vice President-Sales and Marketing.

2. Term. Subject to the termination provisions set forth in Section 5 below, the term of Executive's employment with the Company under this Agreement shall commence on the Effective Date and shall continue until the first anniversary of the Effective Date (the "Initial Term"). At the conclusion of the Initial Term and any Renewal Term (as defined below) thereafter, and unless terminated earlier, this Agreement shall automatically extend for an additional one (1) year period, unless either party gives the other party written notice at least 60 days prior to the end of the then-current term of such party's intention not to renew this Agreement for the following annual period (each a "Renewal Term" and, collectively with the Initial Term, the "Term").

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

3. Capacity and Performance. Throughout the Term of this Agreement:

(a) Executive shall serve the Company as its Senior Vice President-Sales and Marketing on a full-time basis and shall perform such acts, duties and responsibilities consistent with his position on behalf of the Company, as are customarily done and performed by individuals holding such position in companies in similar businesses and of similar size to the Company, and such other duties as may be designated from time to time by the Company's Chief Executive Officer or Chief Financial Officer, to whom the Executive shall regularly report. The expenditure of reasonable amounts of time by Executive for personal, charitable or investment activities shall not be deemed a breach of this Agreement, provided that such activities do not interfere with the services required to be rendered by Executive under this Agreement and are not contrary to the interests of the Company.

(b) Executive shall devote his full business time and his reasonable best efforts, business judgment, skill and knowledge exclusively to the advancement of the business and interests of the Company and to the discharge of his duties and responsibilities hereunder.

4. Compensation and Benefits. As compensation for all services performed by Executive under this Agreement and during the Term:

(a) Base Salary. As compensation for the services to be performed under this Agreement, the Company shall pay to Executive, during the Term, an annual salary (the "Base Salary") at the rate of $245,000.00 per annum, less applicable deductions, payable in accordance with the Company's usual payroll practices.

(b) Monthly Performance Bonus. For each calendar month, commencing with December 2016, Executive shall be eligible to receive a monthly performance bonus (a "Performance Bonus") as follows:

i. Executive shall receive a Performance Bonus in the amount set forth on the attached Schedule A corresponding to the applicable Traffic Conversion Percentage for such month (for purposes hereof, "Traffic Conversion Percentage" means the traffic conversion percentage for the Company on a consolidated basis as reported by T-Mobile's Sharepoint System).

ii. In addition to any Performance Bonus earned under subsection i. above, Executive shall receive a $2,500 Performance Bonus for each month in which the Company achieves at least 125% of the Key Sales Objectives

No. 1 (KSO #1) established by T-Mobile for such month (as determined by T-Mobile through its DCS system and final commission report for such month) and Executive shall receive a $2,500 Performance Bonus for each month in which the Company achieves at least 125% of the Key Sales Objectives No. 2 (KSO #2) established by T-Mobile for such month (as determined by T-Mobile through its DCS system and final commission report for such month).

iii. Any earned Performance Bonus shall be paid in accordance with the Company's usual bonus/commission pay practices (typically within 60 days after the end of the calendar month for which the Performance Bonus was earned).

iv. Executive must be employed by the Company on the payment date to receive any Performance Bonus.

(c) One-Time Signing Bonus. The Company shall pay Executive a one-time signing bonus of $120,000.00, which shall be payable in equal quarterly increments of $30,000.00 (less applicable deductions) within fifteen (15) days after the beginning of each calendar quarter occurring in 2017.

(d) Paid Vacation Off. During the Term, Executive shall be entitled to four weeks of paid vacation off annually, to be taken at such times and intervals as shall be determined by Executive, subject to the reasonable business needs of the Company.

(e) Business Expenses. During the Term, the Company shall pay or reimburse Executive for reasonable, customary and necessary business expenses incurred or paid by him in the performance of his duties and responsibilities hereunder, subject to such reasonable substantiation and documentation as may be specified by the Company from time to time.

(f) Other Benefits. During the term hereof, Executive shall be entitled to participate in any and all employee benefit plans generally available from time to time to senior management level employees of the Company (and for which Executive qualifies under the terms of the plans). The Company may alter, modify, terminate, add to or discontinue the employee benefit plans that are from time to time in effect for its employees generally at any time as it, in its sole judgment, determines to be appropriate, without recourse by Executive.

5. Termination.

(a) Termination upon Death or Disability. Executive's employment under this Agreement shall terminate automatically upon Executive's death or if Executive becomes Disabled. For purposes of this Agreement, Executive shall be deemed to be "Disabled" if Executive becomes unable to perform the essential functions and responsibilities of his

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

position with reasonable accommodation, as required under the Americans with Disabilities Act, as the same has and may be amended (the "ADA"), by virtue of physical or mental disability, as defined under the ADA.

(b) Termination by the Company for Cause. During the Term, the Company may immediately terminate this Agreement for "Cause." For purposes of this Agreement, "Cause" shall mean, in each case as determined by the Company:

i. Executive's material breach of any of the terms, provisions or covenants contained in this Agreement which, after written notice from the Company of such breach, has not been cured within thirty (30) days after he receives such notice;

ii. Executive's conviction of or plea of guilty or *nolo contendere* to a felony, misdemeanor or other crime that either (A) involves moral turpitude, dishonesty, fraud, theft, embezzlement, or financial impropriety or (B) provides for a term of imprisonment;

iii. Executive's commission of any act or omission constituting misappropriation, unethical business conduct, disloyalty or breach of fiduciary duty which is injurious to the Company, the specific nature of which shall be set forth in a written notice by the Company to Executive;

iv. Executive's failure to adequately perform his duties, or failure to follow the reasonable instruction of the Company, which after written notice from the Company of such failure, has not been cured within thirty (30) days after he receives such notice;

v. Executive's misappropriation of funds or assets of the Company; or

vi. Executive fails to earn any Performance Bonus during a period of at least three (3) months in any consecutive twelve (12) month period.

(c) Termination by Executive for Good Reason. Executive may terminate his employment for Good Reason provided that (i) Executive has provided the Company with thirty (30) days' prior written notice setting forth in reasonable detail the basis for such Good Reason and (ii) the Company has not cured the Good Reason within such thirty (30) day period, in which case the Termination Date shall be the 30th day after Executive gave such notice The following shall constitute "Good Reason" for termination by Executive:

i. A material reduction of the Base Salary; or

ii. The material removal or diminution of the authority, responsibilities

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

or duties of Executive (other than any such authorities, duties or responsibilities assigned at any time which are by their nature, or which are identified at the time of assignment, as being temporary or short term).

No condition enumerated in the preceding sub-sections (i) and (ii) will be deemed to be Good Reason unless within 30 days of the initial existence of such condition, the Executive will have given the Company written notice thereof specifically describing the condition giving rise to Good Reason and allowing the Company a period of 30 days from the date of receipt of the notice to remedy such condition; and provided further, however, in no event will a condition give rise to Good Reason hereunder unless, within 60 days after the initial existence of such condition, the Executive will have actually terminated his employment with the Company by giving written notice of resignation for failure of the Company to remedy such condition.

(d) Termination under other Circumstances. During the Term, either the Company or the Executive may voluntarily terminate this Agreement upon thirty (30) days' advance written notice to the other party for any reason or no reason whatsoever; it being understood that Executive's employment is at-will.

6. Effect of Termination of Employment.

(a) Upon the termination of this Agreement for any reason, the Executive shall be entitled to, and the Company shall pay Executive, an amount equal to: (i) any earned but unpaid Base Salary covering the period of employment prior to the effective date of termination; and (ii) unreimbursed business expenses pursuant to Section 4 above. Except as otherwise specified in this Section 6(a) or Section 6(b) below, Executive shall not be entitled to any other compensation or benefits upon the termination of his employment with the Company for any reason whatsoever.

(b) If Executive is terminated by the Company without Cause or if Executive terminates his employment for Good Reason, then, subject to Executive signing and delivering to the Company (and not revoking) a general release in favor of the Company, in substantially the form attached hereto as Exhibit A, within 30 days following presentation thereof, and provided that Executive complies with the covenants set forth in Sections 7, 8, 9 and 12 below, in addition to the payments and benefits described in Section 6(a), the Company shall continue to pay Executive, in accordance with the Company's regular payroll practice, Executive's Base Salary for twelve (12) months, less applicable deductions (the "Severance Compensation"); provided, however, that: (i) the first payment of the Severance Compensation pursuant to this Section 6(b) shall be paid on the 60th day following Executive's termination of employment and shall include any amounts due prior thereto, and (ii) if Executive is terminated by the Company without Cause or if Executive terminates his employment for Good Reason prior to December 1, 2017, then the Severance Compensation shall only be paid for the balance of the Initial Term. For the avoidance of doubt, the Executive shall not be entitled to the payments

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

under this Section 6(b), if the Executive's employment is terminated as a result of the Executive's death, if the Executive becomes Disabled, if the Company terminates the Executive's employment for Cause, or if the Executive voluntarily terminates his employment with the Company without Good Reason.

7. Restrictive Covenants.

(a) *Terms.* The Company and Executive acknowledge and agree that for Executive to compete with the Company during the time the Executive is employed by the Company, and for a limited time thereafter, would be contrary to the purposes for which the parties entered into this Agreement. In order to induce the Company to enter into this Agreement, Executive covenants, warrants and agrees, for the benefit of the Company, its parents, subsidiaries, successors and assigns (collectively, the "Protected Parties"), that without first obtaining the express written consent of the Company, which may be granted or withheld in the Company's sole and absolute discretion, Executive shall not, either directly or indirectly:

i. during the period commencing on the Effective Date and ending upon the expiration of one (1) year from the date that Executive ceases to be employed by the Company or any of its Affiliates for any reason (the "Covenant Period"), engage, or compete with any Protected Party, in the Business, or any facet of the Business anywhere within the United States of America, as an employee, independent contractor or otherwise;

ii. during the Covenant Period, have any ownership interest in (whether as a shareholder, partner, member, associate, owner or otherwise), make any loan to or investment in, any corporation, partnership, limited liability company, association, trust, firm or other enterprise which is engaged in, or competes with, any Protected Party in the Business, or any facet of the Business, anywhere within the United States of America; provided, however, that notwithstanding the foregoing, Executive may invest in any publicly-held corporation engaged in the Business, if his aggregate investment does not exceed one (1%) percent in value of the issued and outstanding capital stock of such corporation;

iii. during the Covenant Period, divert from any Protected Party, or by aid of others, do anything which would cause diversion from any Protected Party, of any business with any Customer or supplier with which such Protected Party has any contact or association in connection with the Business; or

iv. during the Covenant Period, solicit, induce or attempt to induce, either directly or indirectly, any employee or independent contractor of any Protected Party, (A) to change his, her or its contractual relationship with any Protected Party, (B) to leave the employment of or terminate his, her or its contractual relationship with any Protected Party, or (C) enter into the employ of or a

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

contractual relationship with Executive, any entity in which Executive has any interest whatsoever, or any competitor of any of the Protected Parties.

(b) *Executive Representations*. Executive hereby represents and warrants to the Company that Executive is not in breach of any existing covenant not to compete, nonsolicitation agreement, confidentiality agreement or other substantially similar agreement, nor will Executive be in breach of any such agreement as a result of his employment with, or performance of services for, the Company.

(c) *Enforcement.* The covenants set forth in this Section 7 shall be a series of separate covenants, one for each and every state, county and other municipal division within the United States of America. The covenants set forth in this Section 7 are reasonable and valid in geographical and temporal scope and in all other respects. If any court determines that any covenant set forth in this Section 7, or any portion of any such covenant, is invalid or unenforceable, the remainder of the covenants set forth in this Section 7 shall not be affected and shall be given full force and effect, without regard to the invalid covenant or the invalid portion. If any court determines that any covenant set forth in this Section 7, or any portion of any such covenant, is unenforceable because of its duration or geographic scope, such court shall have the power to reduce such duration or scope, as the case may be, and to enforce such covenant or portion in such reduced form. The Company and Executive confer jurisdiction to enforce the covenants set forth in this Section 7 on the courts of any jurisdiction within the geographical scope of such covenants. If the courts of any one or more of such jurisdictions hold the covenants set forth in this Section 7, or any portion of any such covenant, unenforceable by reason of the breadth of such scope or otherwise, such determination shall not bar or in any way affect the right of any of the Protected Parties to the relief provided in the courts of any other jurisdiction within the geographical scope of such covenants as to breaches of such covenants in such other respective jurisdictions.

8. Intellectual Property Rights.

(a) *Assignment of Inventions*. Executive recognizes that he may, individually or jointly with others, discover, conceive, make, perfect or develop inventions, discoveries, new contributions, concepts, ideas, developments, processes, formulas, methods, compositions, techniques, articles, machines and improvements, and all original works of authorship and all related know-how, whether or not patentable, copyrightable or protectable as trade secrets for and on behalf of the Company pursuant to this Agreement ("Inventions"). Executive agrees that all such Inventions are the sole and exclusive property of the Company, all to the extent any such Inventions are capable of ownership under applicable law. EXECUTIVE AGREES THAT ANY PARTICIPATION BY HIM IN A COPYRIGHTABLE WORK IS A WORK MADE FOR HIRE, AS DEFINED IN TITLE 17, UNITED STATES CODE, TO THE EXTENT PERMITTED BY LAW FOR THE SOLE AND EXCLUSIVE BENEFIT OF THE COMPANY AND EXECUTIVE HEREBY ASSIGNS TO THE COMPANY ALL OF HIS RIGHTS IN AND TO SUCH INVENTIONS. Executive shall maintain adequate and current written

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

records of all Inventions, which shall remain the property of the Company, as applicable and be available to the Company at all times. At the Company's request Executive shall promptly sign and deliver all documents necessary to vest in the Company, all right, title and interest in and to any Inventions. If the Company is unable, after reasonable effort, to secure Executive's signature on any document needed to vest in the Company all right, title and interest in and to any Inventions, whether because of Executive's physical or mental incapacity or for any other reason whatsoever, Executive hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Executive's agent and attorney-in-fact, to act for and in Executive's behalf and stead to execute and file any such document and to do all other lawfully permitted acts to further the prosecution and enforcement of patents, copyrights or similar protections with the same legal force and effect as if executed by Executive.

(b) *Third Party Intellectual Property*. Executive hereby represents and warrants that he is not a party or subject to any agreements or other arrangements protecting the trade secrets or other intellectual property of any third-party.

9. Confidentiality. In order to facilitate the provision of Executive's services to the Company under this Agreement, the Company has disclosed and will disclose information it considers proprietary and confidential. This information may include, without limitation: (a) business, financial, marketing and operational plans; (b) forecasts and projections; (c) sales plans and data; (d) information which relates to the Company's proprietary products, prototypes, or plans; (e) customer lists and information; (f) the Company's listing information; and (g) other information whether or not identified as confidential of a confidential and non-public nature (collectively, "Confidential Information"); provided, however, that Confidential information shall not include any information: (x) prior to the Effective Date, was generally publicly available; (y) becomes publicly available without fault of or action on the part of Executive; or (z) is acquired by Executive following the cessation of his employment with, or as a member of, the Company from a third party (other than a Protected Party), free of any restrictions as to its disclosure. In connection therewith, the parties agree that:

(a) Executive agrees to hold the Confidential Information in the strictest confidence. Executive will not disclose the Confidential Information to any third party.

(b) Executive will not, at any time, use the Confidential Information in any fashion, form, or manner, except to facilitate the provision of services by Executive on behalf of the Company.

(c) Confidential Information may not be copied or reproduced without the Company's prior written consent.

(d) Confidential Information shall at all times remain the sole property of the Company. Executive shall have no license, ownership rights, or any other rights or interests in the Confidential Information. Confidential Information disclosed by the Company, including copies thereof, shall be returned to the Company by Executive upon

request by the Company; provided, however, that upon termination of this Agreement, Executive shall return any Confidential Information within ten (10) days of such termination, without any request by the Company being necessary or required.

10. Specific Performance. In the event of a breach or attempted breach of any of the covenants set forth in Section 7, Section 8 or Section 9, in addition to any and all legal and equitable remedies immediately available, such covenants may be enforced by a temporary and/or permanent injunction. The parties agree that the remedy at law for a breach or threatened breach of any of the covenants set forth in Section 7, Section 8 or Section 9 would be inadequate.

11. Key Man Insurance. Executive agrees that the Company may obtain a "key man" life insurance policy on Executive's life, at the Company's sole expense and with the Company as the sole beneficiary thereof. Executive shall (i) cooperate fully with the Company in obtaining such life insurance, (ii) sign any necessary consents, applications and other related forms or documents, and (iii) take any required medical examinations.

12. Cooperation. Following termination of the Executive's employment for any reason, at the request of the Company, (i) the Executive shall, during the three month period following termination of employment, (A) cooperate with the Company in transitioning his duties and activities on behalf of the Company to one or more executives of the Company, and (B) provide information and other assistance relating to the business operations and activities of the Company to representatives of the Company, as requested by the Company; and (ii) the Executive shall cooperate with the Company in connection with any litigation or regulatory matters in which the Executive may have relevant knowledge or information. The Company shall reimburse the Executive for the reasonable expenses and costs incurred by him in connection with such cooperation and assistance.

13. Indemnification. Subject to limitations imposed by law, the Company shall indemnify and hold harmless Executive to the fullest extent permitted by law from and against any and all claims, damages, expenses (including reasonable attorneys' fees), judgments, penalties, fines, settlements, and all other liabilities actually and reasonably incurred or paid by him in connection with the investigation, defense, prosecution, settlement or appeal of any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and to which Executive was or is a party or is threatened to be made a party by reason of the fact that Executive is or was an officer, employee or agent of the Company, or by reason of anything done or not done by Executive in any such capacity or capacities, provided that Executive complied with his obligations under this Agreement, Executive acted in good faith, in a manner that was not grossly negligent or constituted willful misconduct and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The Company also shall pay any and all expenses (including reasonable attorney's fees) incurred by the Executive as a result of the Executive being called as a witness in connection with any matter involving the Company and/or any of its officers or managers.

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

14. Notices. All notices, requests, consents and other communications, required or permitted to be given under this Agreement shall be personally delivered in writing or shall have been deemed duly given when received after it is posted in the United States mail, postage prepaid, registered or certified, return receipt requested addressed as set forth below. In addition, a party may deliver a notice via another reasonable means that results in the recipient party receiving actual notice, as conclusively demonstrated by the party giving such notice.

If to the Company:

TCC Wireless, LLC
565 Randy Road
Carol Stream, Illinois 60188
Email: jay@tccmobile.com
Fax:
Attn: Mr. Javed Malik

If to Executive:

Kenneth Siller
10535 Keller Road
Clarence, New York 14031
Email: ksiller@hotmail.com
Fax: ____________________

15. Miscellaneous.

(a) The failure of any party to enforce any provision or protections of this Agreement shall not in any way be construed as a waiver of any such provision or provisions as to any future violations thereof, nor prevent that party thereafter from enforcing each and every other provision of this Agreement. The rights granted the parties herein are cumulative and the waiver of any single remedy shall not constitute a waiver of such party's right to assert all other legal remedies available to it under the circumstances.

(b) This Agreement has been executed in, and shall be construed and enforced in accordance with the laws of the State of Illinois, without regard to the conflict of law rules of such state. The state and federal courts sitting in the state of Illinois shall have exclusive jurisdiction over any and all disputes arising out of or relating to this Agreement. Each party to this Agreement irrevocably and unconditionally (i) consents to the exclusive jurisdiction of such courts in respect of any action, suit or proceeding arising out of or relating to this Agreement, (ii) waives any defense of lack of personal jurisdiction in such courts in respect of any action, suit or proceeding arising out of or relating to this Agreement, and (iii) waives any objection to the laying of venue of any action, suit or proceeding arising out of or relating to this Agreement.

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

(c) The provisions of this Agreement are severable and if anyone or more provisions may be determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions and any partially unenforceable provision to the extent enforceable in any jurisdiction nevertheless shall be binding and enforceable.

(d) This Agreement sets forth the entire understanding and agreement of Executive and the Company with respect to its subject matter and supersedes all prior understandings and agreements, whether written or oral, in respect thereof. No modification, termination or attempted waiver of this Agreement shall be valid unless in writing and signed by the party against whom the same is sought to be enforced.

(e) The rights and obligations of Company under this Agreement shall inure to the benefit of, and shall be binding on, Company and its successors and assigns. This Agreement is personal to Executive and he may not assign his obligations under this Agreement in any manner whatsoever and any purported assignment shall be void. For all purposes under this Agreement, the term "Company" shall include any successor to Company's business and/or assets that assume the Company's rights and obligations under this Agreement.

(f) The headings and captions used in this Agreement are for convenience of reference only and shall not be considered in interpreting this Agreement.

(g) Each party expressly represents and warrants to each other that: (i) before executing this Agreement, such party has fully informed itself of the terms, contents, conditions and effects of this Agreement; (ii) such party has relied solely and completely upon its own judgment in executing this Agreement; (iii) such party has been advised to and has had the opportunity to seek the advice of counsel before executing this Agreement; (iv) such party, whether or not it chose to seek the advice of counsel, has acted voluntarily and of its own free will in executing this Agreement; (v) such party, whether or not it chose to seek the advice of counsel, is not acting under duress, whether economic or physical, in executing this Agreement; and (vi) and such party, if it chose not to seek the advice of counsel, shall not raise any claims against the enforcement of this Agreement that arise from its decision not to do so.

(h) This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document, and copies (facsimile, photostatic, electronic or otherwise) of signatures to this Agreement shall be deemed to be originals and may be relied upon to the same extent as though such copy, fax or electronically transmitted signature was an original.

(i) Any payments provided for in this Agreement shall be paid net of any applicable income tax withholding required under federal, state or local law.

16. Survival. Sections 6, 7, 8, 9, 10, 12 and 13 will survive and continue in full force in accordance with their terms notwithstanding any termination of this Agreement.

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

17. Section 409A. It is intended that this Agreement will be exempt from, or comply, with Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") and any regulations and guidelines promulgated thereunder (collectively, "Section 409A"), and the Agreement shall be interpreted on a basis consistent with such intent. No action or failure to act pursuant to this Section 17 shall subject the Company to any claim, liability, or expense, and the Company shall not have any obligation to indemnify or otherwise protect Executive from the obligation to pay any taxes, interest or penalties pursuant to Section 409A. Notwithstanding any provision to the contrary in this Agreement, if Executive is deemed on the date of his "separation from service" (within the meaning of Treas. Reg. Section 1.409A-1(h)) with the Company to be a "specified employee" (within the meaning of Treas. Reg. Section 1.409A-1(i)), then with regard to any payment or benefit that is considered deferred compensation under Section 409A payable on account of a "separation from service" that is required to be delayed pursuant to Section 409A(a)(2)(B) of the Code (after taking into account any applicable exceptions to such requirement), such payment or benefit shall be made or provided on the date that is the earlier of (i) the expiration of the six (6)-month period measured from the date of Executive's "separation from service," or (ii) the date of Executive's death (the "Delay Period"). Upon the expiration of the Delay Period, all payments and benefits delayed pursuant to this Section 17 (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to Executive in a lump sum and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein. Notwithstanding any provision of this Agreement to the contrary, for purposes of any provision of this Agreement providing for the payment of any amounts or benefits upon or following a termination of employment that are considered deferred compensation under Section 409A, references to Executive's "termination of employment" (and corollary terms) with the Company shall be construed to refer to Executive's "separation from service" (within the meaning of Treas. Reg. Section 1.409A-1(h)) with the Company. Whenever payments under this Agreement are to be made in installments, each such installment shall be deemed to be a separate payment for purposes of Section 409A.

*[Signatures on following page]*

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

**IN WITNESS WHEREOF,** the parties have executed this Employment Agreement as of the day and year first above written.

**COMPANY:**

TCC WIRELESS, LLC, a Delaware limited liability company

By: ____________________

Print Name: JAVED MALIK.

Its: CEO.

**EXECUTIVE:**

____________________

KENNETH SILLER

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

**Exhibit A**
Form of Release

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Kenneth Siller ("Executive") hereby delivers this Release ("Release") to TCC Wireless, LLC, a Delaware limited liability company (the "Employer") in connection with the termination of Executive's employment with Employer and its subsidiaries. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in that certain Employment Agreement dated as of December 1, 2016, by and between Employer and Executive (the "Employment Agreement").

1. Executive Release of Rights. Except for the payments to be made following the Termination Date to Executive pursuant to Section 6 of the Employment Agreement, Executive (defined for the purpose of this Section 1 as Executive and Executive's agents, representatives, attorneys, assigns, heirs, executors, and administrators) fully and unconditionally releases Employer, its subsidiaries and each of its respective past or present employees, agents, insurers, attorneys, administrators, officers, directors, shareholders, members, managers, parents, predecessors, successors, employee benefit plans, and the sponsors, fiduciaries, or administrators of Employer's employee benefit plans (collectively, the "Released Parties") from, and agrees not to bring any action, proceeding, or suit against any of the Released Parties regarding, any and all liabilities, claims, demands, actions, causes of action, suits, grievances, debts, sums of money, agreements, promises, damages, back and front pay, costs, expenses, attorneys' fees, and remedies of any type, from the beginning of time to the date hereof, including, without limitation, any liability arising or that may have arisen out of or in connection with Executive's employment with, or termination of employment from, Employer, including, but not limited to, claims, actions or liabilities under (1) Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Civil Rights Act of 1866, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Fair Labor Standards Act, the Family and Medical Leave Act, the Worker Adjustment and Retraining Notification Act, the Older Workers Benefit Protection Act, and the Employee Retirement Income Security Act of 1974; (2) any other federal, state or local statute, ordinance, or regulation regarding employment, termination of employment, or discrimination in employment, and (3) the common law of any state relating to employment contracts, wrongful discharge, defamation, or any other matter, provided, however, that Executive is not releasing, and is not agreeing to forego bringing any action, suit or proceeding regarding (A) any claim that cannot be legally released, (B) any claim based upon any vested benefits Executive may have under any employee welfare benefit plan of Employer or its subsidiaries, or (C) any of his rights under this Release.

2. Waiver of Reinstatement. Executive waives any reinstatement or future employment with Employer or its subsidiaries and agrees never to apply for employment or otherwise seek to be hired, rehired, employed, re-employed, or reinstated by Employer or any of its subsidiaries.

3. Severability. The provisions of this Release shall be severable and the invalidity of any provision shall not affect the validity of the other provisions; provided, however, that upon a finding by a court of competent jurisdiction that any release in Section 1 above is illegal, void

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

or unenforceable, Executive agrees to execute promptly a release and covenant that is legal and enforceable.

4. Governing Law. This Release shall be governed by and construed in accordance with the laws of the State of Illinois without regard to conflicts of laws principles that would cause any state's laws, other than the laws of the State of Illinois, to apply.

5. Scope of Release. Executive understands that he remains bound to those provisions in his Employment Agreement that survive the termination of his employment in accordance with Section 7, 8 and 9 thereof. Except as specifically set forth in such provisions, this Release contains the entire agreement and understanding between Executive and Employer concerning the matters described herein, and supersedes all prior agreements, discussions, negotiations, understandings and proposals of the parties. The terms of this Release cannot be changed except in a subsequent document signed by both parties.

6. Revocation Period. Executive has the right to revoke this Release solely with regard to his release of claims under the Age Discrimination in Employment Act and the Older Workers Benefit Protection Act for up to seven (7) days after he signs it. In order to revoke this Release, Executive must sign and send a written notice of the decision to do so, addressed to Employer, and that written notice must be received by Employer no later than the eighth (8th) day after Executive signed this Release. If Executive revokes this Release, Executive will not be entitled to any consideration from Employer described in Section 6 of the Employment Agreement.

7. Knowing and Voluntary Waiver. Executive acknowledges that:

a. Executive has carefully read this Release and fully understands its meaning;

b. Executive had the opportunity to take up to 21 days after receiving this Release to decide whether to sign it;

c. Executive understands that Employer is hereby advising him, in writing, to consult with an attorney before signing it;

d. Executive is signing this Release, knowingly, voluntarily, and without any coercion or duress; and

e. Everything Executive is receiving for signing this Release is described in the Employment Agreement or this Release and no other promises or representations have been made to cause Executive to sign it.

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

IN WITNESS WHEREOF, Executive has executed this Release as of the date below.

EXECUTIVE:

Dated: 11/30/16

Kenneth Siller

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

# SCHEDULE A

Traffic Conversion Bonus

| Traffic Conversion Percentage | Performance Bonus |
|---|---|
| Less than 9% | 0 |
| At least 9% but less than 10% | $5,000.00 |
| At least 10% but less than 10.5% | $7,500.00 |
| At least 10.5% but less than 11% | $12,000.00 |
| At least 11% but less than 11.5% | $15,000.00 |
| At least 11.5% but less than 12% | $17,500.00 |
| At least 12% | $20,000.00 |

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

# EXHIBIT 4

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

**From:** Andrea Sealey <asealey@expmgnt.com>
**Date:** Tuesday, August 20, 2019 at 8:57 AM
**To:** Andrea Sealey <asealey@expmgnt.com>
**Subject:** IMPORTANT Organizational Announcement

**[External]**



August 20, 2019

At Express, we are committed to the continued growth of our employees and the company as a whole. We are always looking for new ways to bring both our employees and our company to the Next Level while not losing sight of our Employee First initiatives. It is in the spirit of continued growth and positioning ourselves to be in the best spot for potential expansion that Express Stores is excited to announce the following organizational changes that will go into effect on Monday, August 26, 2019.



**Ryan Warner**: Ryan has been with Express since joining as the Vice President of Sales in 2012. In 2017, Ryan was promoted to Chief Operating Officer, leading the way through multiple growth and expansion opportunities while overseeing the day to day operations of the

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

company. He has championed many initiatives to continue to put Express in a position for further growth while balancing the direct oversight of the Sales department and strategic oversight for the entire organization. Beginning Monday, August 26, Ryan will assume a new role as the **Chief Executive Officer** for Express Stores. This new role will allow him to focus his energy and leadership on taking Express Stores to the next level. Ryan's passion for an Employee First culture will remain unwavering as he leads the company's strategic growth initiatives and continues to find new ways to make Express Stores an even greater place to work!



**Phil Speiser:** Phil joined Express in May of 2014 as the Vice President of Operations. In 2017, Phil was promoted to Senior Vice President of Operations. During his time with Express, Phil has overseen the growth of the operations team to include Operations Manager support for each market, multiple layers of leadership within the department, the evolution of the Loss Prevention team, and the addition of entirely new departments such as the Reporting and Analytics team. Phil has been an invaluable asset to the operational side of our business during his tenure with Express. On Monday, August 26, Phil will assume a new role as **Chief Operations Officer.** In this new capacity, Phil will continue to oversee the Operations of the business, focusing on new possibilities to develop relevant, more efficient processes and procedures for more streamlined operations to support and protect the company assets.



**Ken Siller:** Express Stores is pleased to welcome Ken to the Express family as **Chief Revenue Officer**. Ken brings with him over 12 years of experience in the Telecom industry, dating back to a start in 2007. He has lead sales teams in T-Mobile and other large partners driving tremendous results and is excited to bring that expertise to Express. Ken understands and values people and is looking to use his passion and experiences to continue to build on our Employee First culture. Ryan Warner previously worked with Ken and has said, "Ken is one of the best leaders I have ever had the pleasure of working with, and I am excited about the potential for Express under his leadership." Ken is a father of four and resides in Buffalo, NY. In his spare time, he is an avid snowmobiler. We look forward to all that Ken will bring to Express to take our sales teams to the next level as he begins his new position on Monday, August 26.

**Andrea Sealey**

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

**Director of Communications and Employee Development**
**Express Stores** | 158 Tices Lane, East Brunswick NJ 08816
p 757-232-7735 | e Andrea.Sealey@T-Mobile.com |

**Connect with Us:**

Express Stores

"We are a team of dynamic wireless leaders that cultivate success through integrity and the commitment to exceed customer expectations to deliver exceptional results"

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the system manager or sender. This message contains confidential information and is intended only for the individual named. If you are not the named individual you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this in error and delete this e-mail from your systems. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

# EXHIBIT 5

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

Jaffe
JAFFE RAITT HEUER & WEISS
A Professional Corporation
27777 FRANKLIN ROAD, SUITE 2500 • SOUTHFIELD, MICHIGAN 48034-8214
PHONE 248.351.3000 • FAX 248.351.3082
www.jaffelaw.com

Patrice S. Arend
parend@jaffelaw.com

August 21, 2019

Kenneth Siller
10535 Keller Road
Clarence, NY 14031

*via email:ksiller@hotmail.com, First Class Mail, Certified Mail and Federal Express*

Re: ***Notice and Demand to Cease and Desist and to Comply with terms of TCC Wireless' Employment Agreement***

Dear Mr. Siller:

This firm is counsel to TCC Wireless, LLC ("TCC Wireless"), your former employer. When you were hired by TCC Wireless on or about December 1, 2016 as its Senior Vice President of Sales and Marketing, you signed an Employment Agreement. You recently voluntarily terminated your employment with TCC Wireless on August 5th.

In your resignation email, you asserted, among other things, that you were improperly paid commissions under your Employment Agreement. As you know, you are not paid commissions on amounts referenced on Share Point, which are internal, directional T-Mobile figures based upon gross activations. When you raised this issue in 2016, TCC Wireless informed you that the commissions for which you now seek compensation were not commissionable; commissions are paid on net conversions, not gross activations. Indeed, no one at TCC Wireless receives commissions on these amounts, which is consistent with standards in the industry. In fact, your Employment Agreement makes specific reference to the "conversion percentage." You accepted that explanation and made no further mention of these commissions until your resignation email, effectively waiving any argument or claim relating to them. As a gesture of goodwill, TCC Wireless nevertheless reviewed your TBC rates in your workbook, which did not match the TBC totals in your supporting documentation. When correcting for the actual TBC numbers appearing in your supporting documentation, the calculation shows, at best, an unpaid amount of $73,500. Without waiving any defenses to any claim relating to your entitlement to the same, TCC Wireless is sending to you a check in that amount, less applicable deductions and withholdings. As it relates to future commissions, such payments are contingent on your active employment with TCC Wireless on the date payments are made. In light of your resignation, you are not entitled to any commissions relating to payments to be made in August or September 2019.

FILED DATE: 8/29/2019 1:08 PM 2019CH10028



As it relates to your claim for PTO time, we have determined based on your last day of employment of August 5, 2019, you had accrued a total of 95.48 hours of PTO time in 2019, of which you used 80 hours. Included in your final check will be pay equivalent to 15.48 hours of accrued but unused PTO time, less applicable withholdings.

TCC Wireless recently learned that you intend to work for Express Stores as its Chief Revenue Officer. You are reminded your post-employment obligations to TCC Wireless are still in effect. In the Employment Agreement, you agreed, among other things, not to work for a competitor for one-year after your employment with TCC Wireless ends. Your employment with Express Stores would be in direct violation of the non-compete obligations in your Employment Agreement.

TCC Wireless has further learned that you owned a T-Mobile retail store during your employment with TCC Wireless, in direct contravention of the terms of and your obligations under your Employment Agreement.

In your Employment Agreement, you further agreed, among other things, not to induce or attempt to induce, either directly or indirectly, any employee of TCC Wireless to end his/her employment or business relationship with TCC Wireless for a period of 12 months following your termination of employment. The Employment Agreement also contains restrictions on your use of confidential TCC Wireless information, and requires you to return all such information and other property upon termination of employment.

TCC Wireless expects its former employees to abide by the terms of the Employment Agreement and its restrictive covenants, as well as any statutory and common law obligations.

Furthermore, you agreed to notify any subsequent employer of your obligations under the Employment Agreement. As a courtesy, TCC Wireless has copied your current employer on this letter to put it on notice of the Employment Agreement and your obligations thereunder, and allow it to support your compliance with your post-employment obligations and to cease any activities that would induce you or any other TCC Wireless employee to violate their respective Employment Agreements or any other applicable law protecting TCC Wireless and its business.

TCC Wireless demands that you cease and desist any activities in breach of your contractual, statutory and common law obligations to TCC Wireless. It will take whatever action it deems necessary to protect its legitimate business interests, including relationships with customers and employees and confidential information. TCC Wireless has authorized this firm to take all necessary legal actions to enforce the Employment Agreement, including seeking court involvement for injunctive relief and monetary damages from you if you choose not to comply. We hope that such actions will not be necessary.

FILED DATE: 8/29/2019 1:08 PM 2019CH10028



This letter does not purport to be a complete statement of all facts, claims or remedies, or a waiver of any of them, all of which are expressly reserved. Should you have any questions, feel free to contact me.

Very truly yours,

**Jaffe, Raitt, Heuer & Weiss**
Professional Corporation

Patrice S. Arend

CC: Ed Rosero (*Via email: erosero@expmgnt.com* and *first class mail*)
Express Stores
158 Tices Lane
East Brunswick, NJ 08816

Eric Tarasievich (via email)

Return Date: No return date scheduled
Hearing Date: 12/27/2019 10:00 AM - 10:00 AM
Courtroom Number: 2410
Location: District 1 Court
Cook County, IL

FILED
8/29/2019 1:08 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019CH10028

6383252

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

**IN THE CIRCUIT COURT OF COOK COUNTY**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | | |
|---|---|---|
| TCC WIRELESS, LLC, a Delaware limited liability company, | ) | |
| Plaintiff, | ) | Case No.: 2019 CH 10028 |
| v. | ) | |
| KENNETH SILLER, an individual, | ) | |
| Defendant. | ) | |

**TCC WIRELESS LLC'S VERIFIED EMERGENCY MOTION**
**<u>FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

Plaintiff TCC WIRELESS, LLC moves this Honorable Court pursuant to 735 ILCS § 5/11-101 of the Illinois Code of Civil Procedure for the entry of a temporary restraining order and preliminary injunction against Defendant Kenneth Siller. In support of its motion, TCC Wireless has filed a memorandum of law, which memorandum is incorporated herein.

WHEREFORE, Plaintiff TCC Wireless respectfully requests that this Court enter an order:

(A) Granting Plaintiff TCC Wireless, LLC's motion;

(B) Entering an injunction temporarily and preliminarily prohibiting Defendant during the period ending August 5, 2020 from working for any competitor of TCC Wireless, LLC, including Express Stores, in the following states: Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Massachusetts, New York, New Jersey, Ohio, Pennsylvania, Rhode Island, South Carolina, and Wisconsin, and any other state in which TCC Wireless may engage within the restrictive period;

(C) Entering an injunction temporarily and preliminarily prohibiting Defendant during the period ending August 5, 2020 from soliciting, inducing or attempting to induce, either

FILED DATE: 8/29/2019 1:08 PM 2019CH10028

directly or indirectly, an employee or independent contractor of TCC Wireless, LLC to change his, her or its contractual relationship with TCC Wireless or to enter into the employ of or a contractual relationship with Defendant, or an entity in which Defendant has an interest, or of any competitor of TCC Wireless, LLC;

(D) Entering an injunction temporarily and preliminarily prohibiting Defendant during the period ending August 5, 2020 from diverting from TCC Wireless, LLC, or by aiding others, doing anything which would cause diversion from TCC Wireless, of any business with any past or present customer or supplier of TCC Wireless, LLC with whom Defendant had any contact or learned of during his employment;

(E) Entering an injunction temporarily and preliminarily prohibiting Defendant from using or disclosing any of TCC Wireless, LLC's Confidential Information; and

(F) Awarding such other and further relief that TCC Wireless may be entitled, to the extent permitted by applicable law, including its costs.

Date: August 29, 2019

Respectfully submitted,

**TCC WIRELESS, LLC**

By: /s/ Louis J. Phillips

Louis J. Phillips
Patzik, Frank & Samotny Ltd. (Firm ID: 35160)
200 South Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 551-8300
lphillips@pfs-law.com

Patrice S. Arend (IL. 6228772)
27777 Franklin Road, Suite 2500
Southfield, MI 48034
248.351.3000
parend@jaffelaw.com
*Attorneys for TCC Wireless, LLC*